James SLEVIN, Mary Slevin, Brian Clinton, Joan Clinton, Dr. Stanley C. Fell, and Frank D'Amico, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

CITY OF NEW YORK, New York City Board of Ethics, Edward I. Koch, as Mayor of the City of New York, Francis T. P. Plimpton, as Chairman of the Board of Ethics, and Powell Pierpoint and Barbara Scott Preiskel, as Members of the Board of Ethics, and David N. Dinkins, as City Clerk, Defendants.

No. 79 Civ. 4524.

United States District Court,
S. D. New York.

Sept. 6, 1979.

---

**41.** See *United States v. Reese*, 92 U.S. 214, 23 L.Ed. 563 (1875); Sands, Statutory Construction §§ 44.12–44.18.

Gordon & Schechtman, New York City, for plaintiffs by Murray A. Gordon, Helene Freeman, New York City, of counsel.

Allen G. Schwartz, Corp. Counsel, City of New York, New York City, for defendants by James G. Greilsheimer, Jeffrey Friedlander, Deborah Rothman, Paul T. Rephen, New York City, of counsel.

SOFAER, District Judge.

This is a civil class action brought by plaintiffs on their own behalf and on behalf of all persons employed as Battalion Chiefs, Deputy Chiefs, and Medical Officers in the New York City Fire Department, and their spouses, for a judgment declaring Local Law No. 48 ("LL 48") unconstitutional and enjoining enforcement of LL 48 *pendente lite* and permanently.[1] LL 48 is a financial

---

1. Jurisdiction is based on 28 U.S.C. §§ 1331 & 1343(3). The causes of action are alleged to arise under 42 U.S.C. § 1983, and the relief sought is authorized by 28 U.S.C. §§ 2201 & 2202.

disclosure law enacted by the City Council and approved by the Mayor, effective July 27, 1979. It is broad in scope and applies to civil service employees such as plaintiffs, who earn over $30,000 per year, to candidates for City office, and to every elected and appointed official. A motion seeking to restrain enforcement temporarily was made on August 27, 1979, since the forms required by the statute must be filed by September 5. After argument, it became clear to all concerned that a decision granting a preliminary injunction, rather than merely a TRO, would suit the interests of the parties as well as dispense with the need for an additional hearing within the next few days. Consequently, and on the basis of the findings and conclusions contained in this opinion, the defendants are enjoined *pendente lite* from enforcing LL 48 against the plaintiff classes as it is presently written and designed to operate.

## I. *Scope and Operation of the Challenged Statute*

The information required by Section 1106–5.0 and LL 48 covers three general areas: income, debts, and property held. It applies with equal force to the employee and to his or her spouse, but not to any other member of the employee's family.

The employee must report income of over $1,000 received by the employee or spouse during the previous year from any "professional organization" in which the employee or spouse "is an officer, director, partner, proprietor or employee" or for which either serves in an advisory capacity. The name and address of any such organization must be provided. In addition, the report must identify any source of income over $1,000 received by the employee or spouse for services other than those performed for a "professional organization." Any capital gain over $1,000 from a single source must be reported, other than from the sale of a residence occupied by the reporting employee. The employee and spouse must also report reimbursements of expenditures of $1,000 or more from a single source, and

any "honoraria" of $500 or more from a single source, giving the name and address of each such source. Finally, the employee and spouse must report all gifts totalling $500 or more from a single source, including presumably gifts from each other.

The employee and spouse must report all debts "to a single creditor" of $5,000 or more "for a period of at least 90 consecutive days." Each creditor must be listed, and the form requires that the creditor's address be revealed.

Any significant wealth owned by the employee or spouse seems covered by the law. Any investment valued at $20,000 or more must be listed and described, along with the value at time of purchase or receipt. Any real property owned which is worth more than $20,000 must be listed, including the property's "address or precise location" and the value at the time of purchase or receipt. Finally, any beneficial interest in a trust or fiduciary relationship valued at $20,000 or more must be listed. In all the listings required, each item's value must be described by category, with the reporting employee checking the category applicable in his case.

The disclosures required by a predecessor of LL 48 (LL 1 of 1975) were challenged on a variety of grounds in the state courts during 1977. In *Hunter v. City of New York*, 58 App.Div.2d 136, 396 N.Y.S.2d 186 (1st Dep't 1977), the statute in general was upheld on the authority of *Evans v. Carey*, 40 N.Y.2d 1008, 391 N.Y.S.2d 393, 359 N.E.2d 983 (1976), where the Court of Appeals upheld an executive order mandating similar financial disclosures by many State employees. But Justice Birns, in a thoughtful and unanimous opinion for the Appellate Division, declared the Act invalid insofar as it contained no mechanism for preventing automatic public disclosure. The Court of Appeals affirmed this decision, 44 N.Y.2d 708, 405 N.Y.S.2d 455, 376 N.E.2d 928 (1978), leading the City Council to amend the law to provide a mechanism by which employees might assert claims of pri-

vacy. The City argues that the mechanism provided by LL 48 is valid and sufficient, patterned as it is on the procedure used for State employees, which was upheld in *Evans* and referred to with approval by the Appellate Division.

The law as it presently stands provides no mechanism by which reporting employees may be spared from reporting any item arguably required to be disclosed. Each employee must complete the reporting form provided by the City, and file the form with the City Clerk. Any question the employee may have with respect to what information must be reported must be dealt with initially by the employee. The "Information Manual on Disclosure of Financial Interests" prepared by the City does little more than repeat the words of the law. Thus, for example, if an employee is in doubt as to whether a non-cash gift worth more than $500 must be reported, the employee must resolve the question without any assistance from the City. No regulations attempting to explain or interpret the law have been promulgated, and none is intended or required by the statute. The Information Manual warns, however, that if the employee fails to *"follow all the instructions carefully you may violate the law or lose certain rights,"* and the law itself makes any "intentional violation" a misdemeanor punishable by a year in prison and/or a fine of up to $1,000.

The completed forms filed by employees are automatically available to any "member of the public" unless the employee has claimed before a request for disclosure is made (§ 3(d)(1)) that a specific item should be withheld from public inspection because its revelation would constitute an unwarranted invasion of privacy. The statute seems clearly to require the City Clerk to make available to any member of the public all the information in any report as to which no privacy claim is asserted. The City Clerk must notify the filing employee whenever a request "is made" to examine the employee's report. But the City Clerk has published no regulations or rules indicating whether such notification will be given before or after the report is revealed; whether the names and/or addresses of persons seeking such information will be recorded and preserved by the City Clerk, or will be provided to the reporting employee; or whether the persons seeking the report will be asked to give any reason they may have for wanting the information. In the absence of any guidance on these matters, employees (and this court) must assume the reports will be revealed automatically, without notice or record of the specific individual seeking the information, or of his or her claimed purpose or need.

Those employees who seek protection for information they have been forced to include in reports must go through a mandatory procedure that is exacting and requires detailed revelation of the individual's claim. The Information Manual makes clear there are "NO EXCEPTIONS" to the following, three-step process:

1. The employee must state the nature of the information to be kept private and the number and letter of the item in the disclosure report containing the information.

2. The employee must state the reasons why the particular information should be kept from public inspection. The Manual makes clear that the "mere fact that an employee believes that his financial affairs are his own business will not, without more, sustain a claim of privacy. The reasons must be set forth in sufficient detail to enable the Board of Ethics to evaluate the privacy claim."

3. The reasons for each privacy claim must be set forth separately for each item requested to be withheld from public inspection. The City's form provides four pages on which privacy claims are to be detailed, and employees are told to add additional sheets if necessary.

The law requires the Board of Ethics of the City of New York to pass on all privacy claims made by employees filing reports. (No provision entitles the spouse of a reporting employee to assert such claims be-

fore the Board.) The privacy claims made are not adjudicated, however, until a request for public inspection is made of the City Clerk; privacy claims may therefore have to be repeated each year, for years, before they are actually adjudicated.

When a privacy claim must be adjudicated, the law provides three factors for the Board to consider: "(a) whether the item is of a highly personal nature; (b) whether the item in any way relates to the duties of the positions held by such person; (c) whether the item involves an actual or potential conflict of interest." The Board is to make its determination in writing, and to forward it to the City Clerk, who is to make available to requesting persons all information except items the disclosure of which the Board has determined would constitute an invasion of privacy. No provision is made for challenges of the Board's determinations by either the reporting or requesting individual, though the City contends that proceedings under Article 78 of the C.P.L.R. would enable persons to obtain reversals of arbitrary or capricious actions.

How the Board will interpret the disclosure law is presently unknown. It has provided virtually no guidance as to what will constitute matters of a "highly personal nature," or as to how it will apply the statutory standards. In the City's Information Manual, an example is given of a policeman who wishes to keep confidential the location of his private residence, "because of fear of retribution from persons he deals with in his police work." He is informed that, "if his address has not otherwise been made public, as, for example, by a telephone book listing, a privacy request could be made. . . ." The policeman is not told how even such an apparently meritorious request will be decided, although a policy on home addresses could readily be developed in advance. Guided only by the statutory language, one would be justified in assuming that, even if a matter is unrelated to the duties of a reporting employee and involves no actual or potential conflict of interest, it would receive Board protection only if it is "of a highly personal nature."

## II. *Merits of Plaintiffs' Claims*

Plaintiffs' approach in setting forth their claims is as indiscriminate as the approach allegedly taken by the legislature in drafting the disclosure statute. Their brief summarizes their numerous points:

The disclosures mandated by LL 48 implicate revelation not only of the private financial affairs of classified civil servants,—who have attained their position on merit, not by reason of political appointment, and who exercise none of the managerial or policy-making powers which are the proper subject of financial disclosure seeking to demonstrate conflicts in interest,—but also of their political, religious, trade union, and other protected beliefs, activities, or affiliations as well as intra-marital and intra-family confidences and communications as they are reflected in income, expenses, honoraria, gifts, debts, investments and beneficial interests of the City employee or his spouse. No exception is allowed by LL 48 by reason of any consideration of irrelevancy, and those extraordinarily broad disclosures are then made available for the review of any person.[2]

■ Plaintiffs correctly identify several constitutional interests that are potentially impinged upon by financial disclosure laws: the right to privacy, in its many facets,—financial, marital, familial, see *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); and freedom of association, of belief, and of speech, e. g., *Gibson v. Florida Legislative Comm.*, 372 U.S. 539, 557–58, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). These interests trigger important procedural protections including the doctrine that laws affecting fundamental interests should be justified by at least substantial—and perhaps compelling—state interests; that they be narrowly drawn to deal only with the legitimate state interests at stake; and that they be sufficiently clear to provide adequate guidance to individuals interested

---

2. Plaintiffs' Memo. of Law, p. 11.

in complying. *See generally* Judge Wisdom's typically illuminating analysis in *Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979).

The City, though unable to file a brief in the short time available to it, responded accurately at oral argument that financial disclosure laws have been passed by numerous governments and generally upheld. See Note, *The Constitutionality of Financial Disclosure Laws*, 59 Cornell L.Rev. 345 (1974). All of the information sought by LL 48 and its predecessor is the sort of material that may, in proper circumstances, serve to aid government and the public in preventing and uncovering fraud and corruption. Payoffs to government officials often assume some form of income, debt, reimbursement, or capital gain. Conflicts of interest are most effectively revealed by a listing of the assets an individual owns.

■ Skeptics may claim that corrupt persons will not comply with disclosure rules. But the interest in revealing and deterring corruption and conflicts of interest in government is so substantial that legislatures are given considerable latitude in fashioning measures to aid in accomplishing those goals.[3] A law that applies to a government official's spouse may be more suspect than one that applies only to the reporting employee, but under proper circumstances such a law will be upheld. Similarly, one can readily envision valid disclosure laws which would apply to merit, civil servants in relatively non-sensitive positions, and which would make publicly available all important aspects of an official's financial life. One must therefore go beyond plaintiffs' more general claims to find the arguments they advance that raise substantial constitutional issues.

### III. *The Substantial Questions Presented*

■ Plaintiffs make no claim in this case that LL 48 is invalid as it applies to all elected officials, all candidates, or all political appointees, even political appointees in the Fire Department. They limit their attack to the statute's application to three classes of persons: Battalion Chiefs;[4] Deputy Chiefs;[5] and Medical Officers.[6] All three job categories are high ranking positions. But they are merit appointments, earned under the civil service system, and are claimed to lack any "policy-making" responsibilities. The City has not yet addressed these contentions fully, but has already pointed out that persons in plaintiffs' job categories perform more than merely ministerial roles.[7] Yet, plaintiffs seem like-

---

**3.** *See generally*, the discussion in *Plante v. Gonzalez, supra.*

**4.** Plaintiff Slevin affirms that his principal responsibilities as Battalion Chief involve supervising, training and directing the members and supervising the equipment of the Fire Department assigned to the 19th Battalion during his tours of duty. This responsibility is shared with four other Battalion Chiefs in the 19th Battalion, and is limited to the geographical area bounded by Fordham Road to the Cross Bronx Expressway and the Grand Concourse to the Harlem River, encompassing the 19th Battalion. He works under the supervision and direction of the Deputy Chiefs, 7th Division, the Borough Commander and Deputy Borough Commander of the Bronx, the Chief of the Department, and the Commissioner of the Department.

**5.** Plaintiff Clinton affirms that his principal responsibilities as Deputy Chief involve supervising, training and directing the members and supervising equipment of the Department assigned to the 1st Division during his tours of duty. These responsibilities are shared with 4 other Deputy Chiefs, and are limited to the geographical area bounded by 23rd Street and the Battery and the Hudson and East Rivers, comprising the 1st Division. He works under the supervision and direction of the Chief of the Department and the Commissioner of the Department, as well as the Borough Commander and Deputy Borough Commander of Manhattan.

**6.** Dr. Fell's principal responsibilities as a Medical Officer in the FD are examining and rendering treatment to Firemen during his tour of duty. He is also a salaried surgeon at a hospital. He is only one of fifteen such officers serving the Department.

**7.** The City states:
The battalion chiefs and deputy chiefs have broad administrative responsibilities within the Fire Department which include the supervision of the inspection of buildings for fire safety. Fire Department Regulations, §§ 6.4.-

ly to be successful in distinguishing their powers and duties—and hence their opportunities for corruption and conflicts of interest—from those of politicians and policymakers. The procedural doctrines devised by the Supreme Court would appear to require that the legislature exercise, if practicable, greater care in devising disclosure rules for plaintiffs than in drafting rules for disclosure by political officers.

Plaintiffs' objection to disclosure of the financial affairs of spouses is likewise a substantial aspect of their case. Affidavits have been filed by a homemaker spouse who objects to the intrusion LL 48 makes into her personal, marital and familial privacy;[8] and by an employed spouse who objects to public exposure of certain details of her professional life, which she has chosen to keep even from her family.[9] Both of these spouses also fear that public exposure of their finances may cause harm to their families, presumably from kidnappers, burglars, or other criminals. Of course the spouses of all those covered by LL 48 will also be exposed to these same intrusions and dangers. But plaintiffs validly contend that the legislature should, if practicable, exercise greater care in regulating spouses, and particularly those of non-political employees. They also seem correct in arguing that the legislature should be required to make a stronger showing of need in regulating spouses than it may be required to make in regulating employees.

A third argument of plaintiffs seems especially worthy of careful consideration. Plaintiffs object to the requirement that all material not "of a highly personal nature" be subject to automatic public disclosure, and with no apparent protections. Many, if not most, matters which persons in plaintiffs' positions would report are likely to have nothing to do with their duties and to involve no actual or potential conflicts of interest. This is particularly true of mate-

rials concerning the plaintiffs' spouses. Yet, this material must be publicly revealed unless plaintiffs demonstrate that it is "of a highly personal nature." One can imagine many things that would cause embarrassment which might not be deemed "highly personal" by the Board of Ethics. (It is interesting that the public members of the Board of Ethics would not be subject to LL 48's requirements.) Affidavits filed in this case attest to a desire for confidentiality for a variety of reasons that may be strongly felt but are unlikely to be deemed "highly personal": a father wishes to bring up his children without letting them know he is relatively wealthy; a divorced person wants to avoid letting his former spouse know he has been able to accumulate substantial assets; another employee seeks to avoid being asked for loans by friends and relatives; several want to avoid being solicited by salesmen. The statutory scheme lends little or no hope of protection for considerations such as these.

Disclosure might be more readily justified if some showing of need were required of persons wanting to see reports, but the law requires only the payment of a fee. Moreover, the individual seeking disclosure may be able to avoid giving his or her name since the statute requires only that a reporting individual be informed that a request has been made, not who made it or why. It seems fair to anticipate that these reports, once filed, will be sought by the press and by commercial interests, such as salesmen, even if not by outright criminal elements. Given this consequence, plaintiffs seem correct in asserting that the law needs far more justification, and demands greater scrutiny, than a similar law which limited disclosure to legislatively recognized needs and protected individuals from undesirable and dangerous consequences that can readily be anticipated.

---

5; 7.4.4. Even medical officers who examine fire officers for fitness to perform duty and in connection with applications for disability retirement are subject to possibilities for corruption. Fire Department Regulations, Ch. 31.

**8.** Affidavit of Mary Slevin, Order to Show Cause.

**9.** Affidavit of Joan Clinton, Order to Show Cause.

Finally, plaintiffs have pointed out numerous weaknesses in LL 48's mechanism for protecting privacy, beyond its limited scope. Most telling of all plaintiffs' points is the fact that to claim privacy an employee or spouse must make a detailed explanation which is necessarily disclosed to the Office of the City Clerk and, if the issue is tested, to the Board of Ethics.[10] Persons claiming privacy may well have reason to fear improper or accidental disclosure of their privacy claims to the public; the City Clerk is a political appointee, and he and his staff are no more immune from misconduct or error than other political appointees. Improper or negligent acts are even more likely where, as here, no steps have been taken to regulate the handling of the reports and privacy claims or to specify punishments for individuals guilty of mishandling them. Moreover, all privacy claims must be decided in writing, and a person losing a claim of privacy will be forced to litigate or (unless regulations are adopted providing otherwise) suffer the revelation of both the information and the fact that his privacy claim was rejected.

Those who succeed in establishing that disclosure of an item of information would constitute an unwarranted invasion of privacy will also be placed in an awkward situation. Since their reports will be publicly available except for material deemed protected, the public will be placed on notice that some aspect of the financial lives of these individuals is "highly personal." That the aspect of their lives that is withheld will have been found to have no relationship to their duties, or to raise no actual or potential conflict of interest, seems unlikely to guaranty that no effort will be made by members of the public to discover the underlying facts. Indeed, some investigators may be more interested in uncovering non-job related "highly personal" facts than in examining less intensely personal information, however job related.

The overbreadth and vagueness of LL 48, plaintiffs contend, is correctible. Whether plaintiffs are correct will turn, among other things, on whether disclosure inquiries can be formulated to provide the City with arguably necessary information and to infringe less on the privacy of the plaintiff classes; whether demands for disclosure by spouses can be tempered without leaving significant loopholes for corruption or conflicts of interest by the employee; whether all proper governmental objectives can be served without publicly revealing all the information disclosed; whether greater protections can be provided for individuals to the extent disclosure of their finances is required; and whether subjects or areas can be identified in advance, the disclosure of which could be deemed an unwarranted invasion of privacy, without harming the government's regulatory objectives.

At this stage in the litigation it is unnecessary and premature to conclude definitively that plaintiffs are likely to succeed on the merits. When viewed in combination, it appears very possible that plaintiffs will succeed on at least some limited aspects of their claims. Before finally formulating an approach to deciding what aspects of the law may be invalid, however, it seems proper first to allow the City to present evidence and argument on all aspects of the problem, including the need for this law, protective mechanisms that might be provided by agreement, and the practicability of more narrow regulation of spouses and private concerns.

A preliminary injunction is nevertheless appropriate since plaintiffs have certainly presented "serious questions going to the merits" that deserve and require full-dress treatment before any change occurs in the status quo. The Second Circuit has long recognized that injunctions *pendente lite* may properly be granted in such cases, if the other requisites of an injunction are established. *Division 580, Amalgamated Transit Union v. Central New York Region-*

---

**10.** Plaintiffs note that "Councilman Stern, who was the sponsor of this and really revised it, showed great consternation" at discovering "that in order to have your privacy claim rec-

ognized, you have to endure a much greater invasion of privacy . . . ." Transcript of Argument, August 30, 1979, pp. 13–14.

*al Trans. Auth.*, 556 F.2d 659, 662 (2d Cir. 1977); *Sonesta Int'l. Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973).

## IV. Irreparable Injury and the Balance of Hardships

The usual requirement for a preliminary injunction, where serious questions warranting litigation are presented, is that the balance of hardships tips decidedly in favor of the party seeking restraint. In this case, plaintiffs have not only shown that the balance of hardships tips decidedly in their favor, they have demonstrated that they will suffer irreparable injury unless enforcement is enjoined, while the City will at most suffer a limited loss of effective compliance with and enforcement of the law.

Enforcement of LL 48 will, first, require hundreds of individuals to complete the required forms, and to submit them to the City Clerk. Completing the forms will constitute a burden for all, and a substantial burden for those with substantial property, or those wishing to claim that reported items are highly personal. Once filed, the forms will immediately become available to the public. The City conceded at oral argument that the City Clerk has no authority under LL 48 to withhold any report from the public, except those items in a report which the reporting employee has claimed are "highly personal" before the public request is made. All requests to examine reports will therefore have to be honored by the City Clerk, irrespective of the fact that the statute may be invalidated in some respects during this litigation. Persons who claim confidentiality will be forced to detail and to press those claims before the Board of Ethics, and the Board will have to decide such claims, even though disclosure and decision of at least some such claims might prove to have been unnecessary.

Plaintiffs assert, moreover, that no need exists for a disclosure law for employees in their positions, let alone any need to enforce the law while its legality is being determined. LL 48 (and its predecessor) is part of a reaction by legislatures on all levels of government to the corruption and disillusionment of the Watergate era. It is a long leap, however, from the corruption and arrogance of the Nixon White House to the world of New York City's Fire Department. Recent years have provided several seamy tales of malfeasance or misfeasance in our local executive and legislative branches; but no single instance of impropriety has been uncovered or investigated among the classes of officers who are plaintiffs in this action.[11] While the City Council might have had a reasonable basis for treating themselves and other political figures with suspicion, no empirical basis has yet been advanced for treating civil service Fire Department personnel and their spouses in the same way. Perhaps this lack of any demonstrable need for such extensive disclosure will not matter when this case is decided on the merits. But on this record it seems clear that a short delay in enforcing LL 48 against the plaintiff classes is unlikely to cause any significant (or indeed discernible) amount of illegal activity to occur unchecked.

The City claims, however, that even if its Fire Department is the "finest in the nation," and even conceding no basis exists for predicting that corrupt acts will occur among the plaintiff classes *pendente lite*, LL 48 should be enforced forthwith to avoid undermining the law's stature and its effectiveness in restoring public confidence in City officials and employees. Governments have a substantial interest in having laws

---

11. Counsel for the City noted that plaintiffs "are the people who are identified by the public as part of officialdom. They have the opportunity to engage in proper or improper activities." He disclaimed suggesting, however, "that the chiefs and deputy chiefs are corrupt people. In fact, they are probably the backbone of the finest fire department in the country." Transcript of Argument, Aug. 30, 1979, p. 24. He conceded, when asked, that no suggestion exists of theft, bribery or corruption among the plaintiff classes or their spouses, and that no evidence of Fire Department corruption was cited in the City Council's records. He could refer the court to no single investigation or conviction for corruption within the last twenty years of a person in the plaintiff classes. *Id.* 30–31.

accepted, and prompt enforcement gives laws their maximum impact. But this interest should be given full recognition and weight only when time and experience have shown a need for the law invoked. *Compare Cheeseman v. Carey,* 79 Civ. 4265, S.D. N.Y. (Sept. 8, 1979) (refusing to enjoin enforcement of the Taylor Law's double penalty provision against prison guards and security officers for engaging in an illegal strike). Here, the law adopted will still be enforced against all political officers, candidates, and political appointees. The law's enforcement will be delayed only with respect to classes of officers concerning whom there has been no legislatively compiled record of need, and in fact no evidence of need.

The City also argues that plaintiffs have delayed unnecessarily in seeking injunctive relief, and that to grant relief now will require the City to circulate its forms and manuals once again in the future, at some additional expense and inconvenience. Plaintiffs have not delayed unreasonably. Plaintiffs' counsel has persistently and constructively battled against the City's disclosure law. His efforts have accounted for many changes, including the victory in *Hunter* which led the City to incorporate the mechanism for testing privacy claims. This process of negotiation and litigation has continued since 1975, when the City first adopted a disclosure statute. LL 48 was approved by the Mayor on July 27, 1979. It required filing by September 1, 1979, but plaintiffs could not be certain as to what information would be required, or what procedures would be established, until the City promulgated its forms and its Information Manual. These materials were made available on Friday, August 24, 1979, and this action was filed promptly thereafter, on Monday, August 27. The expense and inconvenience a short delay may cause the City would be small compared to the cost and inconvenience to literally hundreds of people in completing and filing many intimate details of their financial, professional, and family lives. Moreover, if the forms were filed irreparable injury would be likely to result from disclosures to the public which the City Clerk would be powerless to prevent.

The City has thus far sought to prevent any injunction of LL 48. It has not yet sought to limit the scope of the injunction issued by restricting the extent of disclosure sought, or by partially or entirely exempting spouses, or by curtailing public access. The City is of course free at any time during this litigation to seek a more limited injunction than is now being entered. Meanwhile, based on the findings and conclusions stated in this opinion, the following order is hereby adopted:

ORDERED that the defendants City of New York, New York City Board of Ethics, Mayor Edward I. Koch, Francis T. P. Plimpton, Powell Pierpoint and Barbara Scott Preiskel, their agents, servants and employees and all persons acting in concert with them, are enjoined from enforcing New York City Administrative Code § 1106–5.0, as amended by Local Law 48 of 1979, against the plaintiff classes and their spouses, pending a final determination that said laws are valid and enforceable under the Constitution of the United States.

SO ORDERED.