James SLEVIN, Mary Slevin, Brian Clinton, Joan Clinton, Dr. Stanley C. Fell, and Frank D'Amico, on their own behalf and on behalf of all others similarly situated,

v.

CITY OF NEW YORK; New York City Board of Ethics; Edward I. Koch, as Mayor of the City of New York; and David N. Dinkins as City Clerk, Defendants.

John J. BARRY, Marguerite V. Barry and James Grebhardt, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

CITY OF NEW YORK; New York City Board of Ethics; Edward I. Koch, as Mayor of the City of New York; and David N. Dinkins, as City Clerk, Defendants.

Nos. 79 Civ. 4524 (ADS), 79 Civ. 4627 (ADS).

United States District Court, S.D. New York.

Nov. 24, 1982.

As Amended Dec. 15, 1982.

Gordon & Shechtman, P.C., New York City, for Slevin plaintiffs; Murray A. Gordon and Richard M. Betheil, New York City, of counsel.

Schofield & Dienst, New York City, for Barry plaintiffs; John P. Schofield, New York City, of counsel.

Frederick A.O. Schwartz, Jr., Corp. Counsel, New York City, for defendants; Deborah Rothman and Denise Thomas, New York City, of counsel.

New York Civil Liberties Union, New York City, amicus curiae; Arthur Eisenberg, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

These class actions present a challenge to one of the scores of financial disclosure laws adopted by legislatures at all levels of American government since the political scandals of the Nixon Administration. Plaintiffs represent uniformed members of the New York City Fire and Police Departments who earn over $30,000 per year, and their spouses. They challenge the constitutionality of Local Law 48 of 1979, N.Y.C. Admin.Code § 1106–5.0 (hereinafter "LL 48"), a financial disclosure law enacted by the New York City Council and approved by the Mayor. Plaintiffs claim that LL 48, as it applies to them, violates their constitutional rights under the first, fourth, fifth, ninth, and fourteenth amendments to the United States Constitution.

Financial disclosure laws were recognized long before the "Watergate" scandal as a potentially useful device for discovering and deterring conflicts of interest. Post-Watergate developments, however, have dramatically expanded the number, scope, and impact of disclosure laws. Few jurisdictions had adopted disclosure laws prior to 1970; those that existed in general applied to officials holding policymaking positions, and required disclosure, limited to the government involved or to other interested persons, of financial facts relevant to the work of the reporting officer. Since then, hundreds of such laws have been adopted at all levels of government; they frequently apply to large groups of employees, including civil service personnel having little or no important policymaking power and they require disclosure to all members of the public, irrespective of any need to know or purpose in knowing, of all the financial facts concerning the reporting employee or official as well as those concerning all members of the reporting person's family.[1]

---

1. Accurate data on the number and scope of disclosure laws are not readily available. The most useful compilation seems to be *The Blue Book: A Compilation of Campaign, Ethics, and Lobbying Reform Laws,* prepared by the Council on Government Ethics Laws, edited by Carla Bailey, and introduced into evidence as Defendant Exhibit H. The Blue Book *is* a 26-page summary of data collected in a survey undertaken by the Council during the summer of 1979. The data collected are very general, and apparently were not verified. But they are useful nonetheless in providing a broad outline of existing legislation.

Questionnaires were sent to responsible officials in all 50 States and the District of Columbia; 38 responded, and 13 filed no response. Of the 38 responding jurisdictions, 28 had disclosure laws that covered "Officers" of state agencies or departments, 19 had laws covering state "Employees," 16 had laws covering municipal officials and/or employees, and 15 had laws covering county officials and/or employees. *Id.* 9. Most disclosure laws were broad in scope, covering all the usual forms of assets and financial transactions. *Id.* 11–12. Of the 28 jurisdictions with some form of disclosure legislation, 25 required disclosure of "Financial

The significance of these developments has been heightened by the large number of Americans now employed by government. Furthermore, since many financial disclosure laws affect not only the privacy of government employees but also the privacy of their spouses and other household members, the number of affected individuals is far greater than the number of employees actually covered. Financial disclosure laws thereby potentially invade the privacy of millions of Americans as individuals and in their marital and family relations.[2]

Legislatively mandated financial disclosure laws do not normally violate the first, fourth, or fifth amendments to the Constitution. If any constitutional principle provides protection against disclosure of private, financial information it is the concept of privacy. Justice Harlan, in his illuminating dissent in *Poe v. Ullman,* 367 U.S. 497, 540, 81 S.Ct. 1752, 1775, 6 L.Ed.2d 989 (1961), recognized that the Constitution is "the basic charter of our society, setting out in spare but meaningful terms the princi-

ples of government." The Constitution must protect "legitimate expectations of privacy," he wrote, not only against physical or electronic invasions but against "all unreasonable intrusion of whatever character." *Id.* at 550, 81 S.Ct. at 1780. *See also Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). More recently, the Supreme Court has indicated that the interest in avoiding disclosure of personal information is constitutionally protected. *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Yet, while virtually every court that has considered financial disclosure laws has stated that the Constitution shields individual and family privacy as to financial matters, few courts have placed constitutional limits of any sort on legislatures requiring financial disclosures and providing that they be available to the public.[3]

Interests of Official's/Employee's Spouse and Dependents." *Id.* 12. And virtually every jurisdiction reporting disclosure laws (27 of 28) made the information disclosed "Available to the Public." *Id.* 13. The responding jurisdictions were also asked to state the "Approximate Number of Filings Annually" under their disclosure laws. The total filings anticipated by those jurisdictions in 1979 was 109,619. This number greatly understates the total persons affected, since 13 jurisdictions did not respond, since most filings cover more than one person, and because additional jurisdictions have adopted disclosure laws after the survey was conducted, including New York, which at that time reported no disclosure law. The state statutes are collected in Comment, 54 N.Y.U.L.Rev. 601 n. 1 (1979).

In addition to these state and local laws, the federal government's disclosure requirements are extensive, and apply to thousands of employees and their families. In 2 U.S.C. §§ 701–709, Congress required all federal legislators, their top aides, and candidates for Congress, to file extensive disclosure forms, including the assets of their spouses and dependent children, and made these forms available for public inspection. Similar provisions govern top executive personnel, including elected officials and candidates, appointed officials, top civil service and military personnel, 5 U.S.C.App. 201–211, and members of the federal judiciary and their top aides, 28 U.S.C.App. §§ 301–309. Provision is made for the President to require any

federal officer or employee not included by these Acts to file. 5 U.S.C.App. § 207(a). *See infra,* text at note 16.

2. In early 1980, 15,885,000 Americans, or 17.5 percent of the total nonagricultural work force, were employed by federal, state, or local government. Bureau of the Census, *Statistical Abstract of the United States* 411 (1980). Of the 15,971,000 employed by governments in October 1979, 2,869,000 were federal employees, 3,699,000 were state employees, and 9,403,000 were employees of local governments. *Id.* at 318.

3. The laws have generated a storm of litigation. *See, e.g., Duplantier v. United States,* 606 F.2d 654 (5th Cir.1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981); *Plante v. Gonzalez,* 575 F.2d 1119 (5th Cir.1978) (cases cited at n. 8), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). With limited exceptions, *e.g., Hunter v. City of New York,* 58 A.D.2d 136, 396 N.Y.S.2d 186 (1st Dept. 1977), *aff'd,* 44 N.Y.2d 708, 405 N.Y.S.2d 455, 376 N.E.2d 928 (1978); *City of Carmel-by-the-Sea v. Young,* 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225 (1970), *Advisory Opinion on Constitutionality of 1975 P.A. 227* (Questions 2–10), 396 Mich. 465, 242 N.W.2d 3 (1976), reviewing courts have upheld the laws. *See generally* cases collected in Note, 73 Mich.L.Rev. 758 (1975); Note, 59 Cornell L.Rev. 345 (1974); Comment, 54 N.Y.U.L.Rev. 601 (1979).

■ Powerful reasons explain why courts have properly been restrained in reviewing disclosure laws on privacy grounds. The right of privacy, as protected by common law and the Constitution, relates to private revelations or direct public regulation of intimate activity, rather than to disclosures by government of information obtained and published for some public purpose.[4] Financial disclosure laws are analogous to long accepted, lawful techniques for obtaining information reasonably necessary for governmental objectives. Furthermore, the objectives sought by financial disclosure laws are in principle unassailable and theoretically justify a broad scope of inquiry. Honest government is so patently a worthy objective, and the capacity for venality in human behavior is so profound and ingenious, that virtually any disclosure law however intrusive might be rationally justifiable. Financial disclosure laws also derive considerable strength from the benefits widely felt to be derived from openness and from an informed public. Justice Brandeis, an eloquent advocate of privacy, said: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Brandeis, *Other People's Money and How the Bankers Use It* 62 (1914), *quoted in Plante v. Gonzalez,* 575 F.2d 1119, 1127 n. 13 (5th Cir.1978). The interest in an informed citizenry also supports a legislature's decision to adopt financial disclosure legislation. An informed public is essential to the nation's success, and a fundamental objective of the first amendment. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

The absence of any clear constitutional provision expressly protecting privacy no doubt adds to the judiciary's reluctance to fashion limits on laws justified as seeking to make government more ethical. None of the more specific and relatively well-defined provisions of the Bill of Rights applies to financial disclosure legislation. Courts are therefore left to consider possible limits based only upon the general right of privacy, an interest that permeates our constitutional scheme but finds no specific expression. While some former Justices of the Supreme Court could peer into the constitutional penumbra and discern with confidence the contours of the privacy right, less visionary readings now prevail. The sweeping claims generally advanced by plaintiffs challenging such laws have made judicial involvement even less tenable than the interests at stake might warrant. Courts have rarely if ever been provided the evidence in specific cases that might establish the propriety of limited protections against the overbroad use of an otherwise proper legislative device.

To the extent plaintiffs in these cases have presented a facial attack on LL 48, their challenge must fail. The Supreme Court's affirmances without opinion of three decisions upholding disclosure laws leave no room for an attack on LL 48's constitutionality as a whole. But plaintiffs in this case insisted, refreshingly, that the Court consider their particular claims, and not merely pass on the law as an abstract exercise. They produced comprehensive evidence of the law's purposes, its legislative background, its scope, its expected effects, and its potential utility. They also proved facts about themselves as municipal servants and human beings, the jobs they do, their record of performance, their fears and feelings.

■ Plaintiffs introduced strong evidence to support their claims that they should be relieved entirely of the burdens

4. Brandeis and Warren sought to expand protection of privacy against "the gossip-monger," not against the lawful demands of government. *The Right to Privacy,* 4 Harv.L.Rev. 193, 198, 204 & n. 1, 206, 216 (1890). As they said: "The right to privacy does not prohibit any publication of matter which is of public or general interest." *Id.* at 214. In *Poe v. Ullman,* 367 U.S. 497, 553, 81 S.Ct. 1752, 1782, 6 L.Ed.2d 989 (1961), Justice Harlan distinguished between regulations that infringe a relationship that the state fosters, such as marriage, and those aimed at enforcing relationships that the state lawfully forbids.

and intrusions created by LL 48. One could reasonably conclude from their evidence that LL 48 is a thoughtless and unwise intrusion by the City into the lives of many of its most valued employees. But the City is constitutionally free to abuse its employees and their families, so long as in doing so it is seeking to achieve a proper objective through a defensible means. Furthermore, with respect to the law's obligation that plaintiffs file the forms required by LL 48, plaintiffs lack any strong expectation of privacy, since such information is already available to the Fire and Police Departments, and the City was able to establish that disclosures of the information to City government might help deter and detect conflicts of interest and venality.

Plaintiffs did succeed, however, in establishing that on the present record the public disclosure aspect of the challenged law would interfere substantially with their privacy interests in autonomy and confidentiality. The law contains a mechanism that would enable covered employees to seek to have highly personal matters kept from public view. But that mechanism would itself be greatly destructive of privacy. Plaintiffs also proved that the public disclosure component of LL 48 serves no defensible purpose with respect to plaintiffs in this case. Public disclosure serves the useful purposes of deterring and detecting corruption, of enabling the public to perform its legislative and elective roles, and of increasing public confidence in and knowledge about government by enabling the public to evaluate all the facts relevant to public issues, including the financial facts about government policymakers. But these purposes lacked any evidentiary support or rational basis in this particular case. Plaintiffs are not elected, and they lack policy-

making roles; rather, they are civil servants who achieved the lower managerial ranks of their agencies through success on competitive exams, after many years of service. The law's purpose as to these plaintiffs appears to be disclosure for disclosure's sake.

On the basis of the findings and conclusions that follow in this opinion, therefore, the City's financial disclosure law is upheld insofar as it requires disclosure to the City government of the family financial data sought from the plaintiff groups. The law is invalid, however, insofar as it mandates disclosure of all the information collected from the plaintiff groups, to any person irrespective of purpose or need.

## I.

LL 48 requires, on pain of criminal penalty,[5] that all covered individuals file annual financial statements with the City. The ordinance covers candidates for City office, most elected and appointed officials, and all civil service employees of the City who earn $30,000 per year or more.[6] LL 48 requires that these people disclose the following information:

"the name, address and type of practice of any professional organization in which the person reporting or his spouse" has any interest "from which income of one thousand dollars or more was derived during the preceding calendar year", § 1106–5.0b, subd. 1;

the source of items "received or accrued during the preceding calendar year" by the employee or his or her spouse constituting income for services rendered of $1,000 or more, § 1106–5.0b, subd. 2;

each capital gain of $1,000 or more from a single source, other than from the sale of the reporting person's residence, id.;

---

5. The law makes any "intentional violation" a misdemeanor punishable by a year in prison and/or a fine of up to $1,000.

6. LL 48 requires the following individuals to file:

(i) the Mayor, City Council President, City Councilmen, Borough Presidents, and Comptroller, and candidates for such positions (Sec. 1106–5.0a, subd. 1, 2); and

(ii) "[e]ach agency head, deputy agency head, assistant agency head, member of any board or commission other than a member of a board or commission who serves without compensation and each city employee who is a member of the managerial pay plan or whose salary is thirty thousand dollars a year or more...." (Sec. 1106–5.0a, subd. 3).

reimbursement for expenditures of $1,000 or more "in each instance," and honoraria or gifts from a single source aggregating $500 or more, *id.;*

each creditor to whom the employee or spouse owed $500 or more for 90 days or more during the preceding year, § 1106–5.0b, subd. 3;

the value and address of each investment or parcel of real property worth $20,000 or more held by the person reporting or spouse, § 1106–5.0b, subd. 4;

and each trust or other fiduciary relation in which the employee or spouse held a beneficial interest having a value of $20,000 or more, § 1106–5.0b, subd. 5.

The identity, source, and amount of each of the foregoing must be reported in detail. §§ 1106–5.0b, subd. 1–6.

The completed forms are filed with the City Clerk, who must automatically make them available to any member of the public, § 1106–5.0c, unless the employee has requested the City's Board of Ethics in writing that a specific item be withheld because public disclosure of it would constitute an unwarranted invasion of privacy, § 1106.5d.

No action is taken on privacy claims until a request for inspection of a particular form is filed by a member of the public. When a request for inspection is made, the law requires that the public members of the Board of Ethics rule on all privacy claims after considering three factors: whether the item is of "a highly personal nature"; whether it "in any way relates to the duties of the position held by such person"; and whether it "involves an actual or potential conflict of interest." § 1106–5d, subd. 2. The Board must render a written decision and forward it to the City Clerk. The Clerk may then make the form requested available for disclosure, except those items exempted from disclosure by a decision of the Board. § 1106–5d, subd. 4.

LL 48 is a modified version of a disclosure law passed by the City Council in 1975, Local Law 1 of 1975 ("LL 1"). The New York courts declared the public disclosure provisions of LL 1 invalid because the law did not safeguard privacy interests. *Hunt-er v. City of New York,* 58 A.D.2d 136, 396 N.Y.S.2d 186 (1st Dep't 1977), *aff'd,* 44 N.Y.2d 708, 405 N.Y.S.2d 455, 376 N.E.2d 928 (1978). LL 48 differs from LL 1 principally in that the Council added the "privacy mechanism" just described.

After passage of LL 48 in 1979, certain members of the New York City Fire Department and their spouses filed one of the instant actions to enjoin its application to them. *Slevin v. City of New York,* No. 79 Civ. 4524 (S.D.N.Y.). The plaintiff classes in *Slevin* include Fire Department Battalion Chiefs, Deputy Chiefs, Medical Officers, and the spouses of these three officer classes. The officers involved are all uniformed city employees, occupying competitive civil service positions, who are required to file financial disclosure reports because they earn over $30,000 annually. This Court preliminarily enjoined application of LL 48 to these plaintiffs on September 6, 1979. *Slevin v. City of New York,* 477 F.Supp. 1051 (S.D.N.Y.1979). Just prior to issuance of that preliminary injunction, certain members of the New York City Police Department and their spouses filed the companion action, *Barry v. City of New York,* No. 79 Civ. 4627 (S.D.N.Y.), challenging LL 48 as applied to them. The *Barry* plaintiffs also represent four groups: Captains, Lieutenants, Police Surgeons, and their spouses. All the officers represented are uniformed city employees, occupying competitive civil service positions, who earn in excess of $30,000 annually. On September 10, 1979, the preliminary injunction issued in *Slevin* was expanded to include the *Barry* plaintiffs. The matters were consolidated, and tried on the merits, after which the parties briefed the issues prior to submitting the case for judgment.

## II.

Defendants urge the outright rejection of plaintiffs' claims, because the Supreme Court has dismissed for lack of a substantial federal question three appeals from decisions by state supreme courts upholding financial disclosure laws. *Montgomery County v. Walsh,* 274 Md. 502, 336 A.2d 97

(1975), *app. dismissed,* 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306 (1976); *Fritz v. Gorton,* 83 Wash.2d 275, 517 P.2d 911 (en banc), *app. dismissed,* 417 U.S. 902, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974); *Stein v. Howlett,* 52 Ill.2d 570, 289 N.E.2d 409 (1972), *app. dismissed,* 412 U.S. 925, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973). These dismissals are dispositions on the merits, binding on "the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam); *see Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975); *Port Authority Bondholders Protective Comm. v. Port of New York Authority,* 387 F.2d 259, 262 n. 3 (2d Cir.1967). They do indeed foreclose several of plaintiffs' claims, especially in conjunction with other Supreme Court decisions. But they cannot fairly be said to preclude all of plaintiffs' challenges. Here, as in *Plante v. Gonzalez,* 575 F.2d 1119, 1125 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), the statute at issue differs from each of the statutes upheld in those cases, and the nature of the challenge made in this case differs in important respects from the challenges to those statutes.

All three dismissals involved facial challenges to the disclosure laws at issue; here, plaintiffs challenge LL 48 as it applies to them. Furthermore, none of the dismissed cases focused on the constitutionality of requiring public disclosure by employees with little or no policymaking authority. In *Fritz v. Gorton, supra,* only disclosure by elected officials, candidates for elective office, and lobbyists was at issue. The ordinance challenged in *Montgomery County v. Walsh, supra,* unlike LL 48, provided for disclosure by employees only "where it is determined by designated authority that it is 'desirable to promote the trust and confidence of the citizens of the County,'" and exempted from the filing requirements persons whose job responsibilities posed little likelihood of conflict of interest or corruption. 336 A.2d at 102. The Illinois Supreme Court's opinion in *Stein v. Howlett, supra,* was based entirely upon state law,

and, as in *Fritz* and *Montgomery County,* the appeal to the United States Supreme Court was dismissed in 1973, before the Supreme Court's decisions in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) and *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), which both recognized a constitutional "interest in avoiding disclosure of personal matters." *Whalen v. Roe,* 429 U.S. at 599, 97 S.Ct. at 876.

The plaintiff classes in this case have demonstrated that public disclosure of their finances will substantially and adversely affect recognized privacy interests, while serving no substantial public purpose. The Supreme Court has not considered the public disclosure aspects of disclosure laws on a full evidentiary record, revealing both the effects of and need for disclosure to the government and to the public of private information obtained from particular groups of employees. Consequently, although the dismissals for lack of a substantial federal question may "caution ... against finding [LL 48] unconstitutional", *Plante v. Gonzalez, supra,* 575 F.2d at 1126, this Court must "undertake an independent examination of the merits," *Mandel v. Bradley, supra,* 432 U.S. at 177, 97 S.Ct. at 2241.

### III.

Plaintiffs argue that LL 48 infringes their fourth amendment right to be free of unreasonable searches and seizures, their fifth amendment right against compelled self-incrimination, their first amendment rights of free speech and association, and their fourteenth (or ninth) amendment right to privacy, that is, their right not to be deprived of the liberty interest in privacy without due process of law. Only the privacy claim has merit, and only to the extent delineated below.

### A. *The Fourth Amendment*

The fourth amendment guarantees "[t]he right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures ...." U.S.Const.amend. IV. "[T]he evil the amendment was designed to prevent was broader than the abuse of a general warrant," *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980), though the amendment has not been "translated into a general constitutional 'right to privacy,'" *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967). The fourth amendment seems applicable to governmental acquisition of information whatever means are chosen, *see generally California Bankers Ass'n v. Shultz,* 416 U.S. 21, 59–63, 94 S.Ct. 1494, 1516–18, 39 L.Ed.2d 812 (1974) (discussing relevance of fourth amendment to reporting income as required by federal tax statutes); certainly it applies "to the orderly taking under compulsion of process," *United States v. Morton Salt Co.,* 338 U.S. 632, 651, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950). "[T]he Fourth Amendment protects people, not places, ... and whenever an individual may harbor a reasonable 'expectation of privacy,' ... he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (citations omitted).

■ Plaintiffs have not argued that the fourth amendment limits the uses to which information legitimately "seized" may be put. Therefore, plaintiffs do not contend that the amendment is directly relevant to the provisions permitting public access to the forms. *See Slevin* Plaintiffs' Post-Trial Memorandum at 72–74. Insofar as the City has required filing, however, plaintiffs argument fails because they lack the requisite expectation of privacy. *See Whalen v. Roe, supra,* 429 U.S. at 602, 97 S.Ct. at 877. An employee in the upper echelons of the Fire or Police Department, or his or her spouse, cannot reasonably expect to keep his financial dealings and holdings, or his address, or any other information required by LL 48, secret from his employer. Plaintiffs established at trial that all of the information sought by LL 48 is available to the Fire and Police Departments through confidential,

in-house inquiries. Transcript of Trial (Nov. 6, 7, 12, 13, 1980) at 524–25 [hereinafter "T."]; Transcript of Trial (Dec. 3, 1980) at 60–68 [hereinafter "T.D."].

■ If plaintiffs had a reasonable expectation of privacy, the filing regulations would nevertheless satisfy the fourth amendment. In this context the amendment demands only reasonableness, *i.e.,* that the information sought be "particularly described" and relevant to an inquiry the investigating agency is authorized to make, and that the legislative judgment have a reasonable basis. *California Bankers Ass'n v. Shultz, supra,* 416 U.S. at 62–63, 94 S.Ct. at 1518; *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967); *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 208–09, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946); *O'Brien v. DiGrazia,* 544 F.2d 543, 546 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). The uniform application of the filing regulations leaves no room for discretionary abuse by enforcement officers and therefore requires no warrant to curb narrowly focused intrusions into the privacy rights of those regulated. *See Camara v. Municipal Court, supra,* 387 U.S. at 530–32, 87 S.Ct. at 1732; *See v. City of Seattle,* 387 U.S. 541, 544, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967); *cf. Nixon v. Administrator of General Services,* 433 U.S. 425, 464 n. 26, 97 S.Ct. 2777, 2801 n. 26, 53 L.Ed. 867 (1977). The information sought by the forms is uniform, described in detail, and relevant in general to the proper governmental objectives of investigating and deterring conflicts of interest. While the scope of inquiry mandated by LL 48 is broad, it cannot be equated with a general warrant, since each type of information sought has logical relevance to valid government objectives.

## B. *The Fifth Amendment*

■ Plaintiffs also assert that LL 48 "implicates the Fifth Amendment protection against compelled testimony that may be self-incriminating." *Slevin* Plaintiffs' Post-

Trial Memorandum at 74–75. Methods employed by the state in requiring disclosures must be "consistent with the limitations created by the privilege." *Marchetti v. United States,* 390 U.S. 39, 44, 88 S.Ct. 697, 700, 19 L.Ed.2d 889 (1968). LL 48 affixes a criminal penalty to failure to respond to the questionnaire, so it exerts real compulsion upon covered employees. *See Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110 (1892). Further, LL 48 elicits "testimony" rather than requiring production of pre-made financial records. *See Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976). Where the information an individual is asked to provide is "testimony which might tend to show that [he] had committed a crime," *Counselman v. Hitchcock, supra,* 142 U.S. at 562, 12 S.Ct. at 197; *see Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973), the filer is entitled to assert his or her privilege against self-incrimination.

 But the fact that the privilege might be available to individuals within the plaintiff classes does not invalidate the law. Like the fourth amendment, the self-incrimination clause of the fifth amendment is not "a general protector of privacy.... [T]he Fifth Amendment protects against 'compelled self-incrimination, not [the disclosure of] private information.'" *Fisher v. United States, supra,* 425 U.S. at 401, 96 S.Ct. at 1576 (quoting *United States v. Nobles,* 422 U.S. 225, 233 n. 7, 95 S.Ct. 2160, 2167 n. 7, 45 L.Ed.2d 141 (1975)). Thus, the privilege does not justify refusal to file an income tax return simply because certain disclosures might tend to incriminate. *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). This is not a case like *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), or *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), where the compulsory disclosure applied only to a group "the great majority of whom [are]

likely to incriminate themselves by responding." *Garner v. United States,* 424 U.S. 648, 660, 96 S.Ct. 1178, 1185, 47 L.Ed.2d 370 (1976). Plaintiffs exerted much effort at trial successfully establishing that only a small proportion of class members are engaged in criminal activity. True, the disclosure forms at issue are not directed to the public at large; but, as with tax returns, "[t]he great majority of persons" filing these forms will "not incriminate themselves" by filing. *Garner v. United States, supra,* 424 U.S. at 661, 96 S.Ct. at 1186.

Nor does LL 48 improperly coerce plaintiffs to waive the privilege. As with income tax statutes, if the form calls for answers that a particular filer is privileged from making he can raise the objection on the form. *United States v. Sullivan, supra,* 274 U.S. at 263, 47 S.Ct. at 607. A conviction under LL 48 for failure to respond "cannot be based on a valid exercise of the privilege." *Garner v. United States, supra,* 424 U.S. at 662, 96 S.Ct. at 1186. "As long as a valid and timely claim of privilege is available as a defense" for failure to file, the fifth amendment is not violated. *Id.* at 665, 96 S.Ct. at 1188. Moreover, plaintiffs could not be discharged from their jobs solely because they claimed the privilege on the form, because the form does not contain "questions specifically, directly, and narrowly relating to the performance of [their] official duties...." *Gardner v. Broderick,* 392 U.S. 273, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968) (footnote omitted). Neither the statute nor the questionnaire makes the prohibited suggestion that a failure to waive the privilege will result in dismissal. *See Garrity v. New Jersey,* 385 U.S. 493, 497–98, 87 S.Ct. 616, 618, 17 L.Ed.2d 562 (1967). Finally, the questionnaire's failure to inform filers of the availability of the privilege is not a constitutional violation, since the ordinance is not part of a focused investigation. *See Escobedo v. Illinois,* 378 U.S. 478, 490–91, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964).[7]

7. Perhaps in a particular situation, even though a claim of valid privilege would be a defense, *see Garner v. United States, supra,* 424 U.S. at 667–68, 96 S.Ct. at 1189 (Marshall, J., concurring), the combined fears of prosecution for failure to file, of loss of a job, and of embar-

## C. The First Amendment

[10] Plaintiffs have failed to establish that LL 48 will significantly inhibit the exercise of their first amendment rights of speech and association. LL 48 was not adopted for the purpose of requiring disclosure of organizational membership. Statutes that require such disclosures have been held to violate the first amendment where they were found to have been intended to restrain the freedom of association. *See, e.g., Louisiana ex rel. Gremillion v. NAACP,* 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *NAACP v. Alabama ex rel. Patterson* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Here, as Judge Wisdom noted in *Plante v. Gonzalez, supra,* 575 F.2d at 1132, "memberships, associations, and beliefs are revealed, if at all, only tangentially." The law requires disclosure of certain assets, income, debts, gifts, and reimbursements, and therefore neither focuses on some political or religious financial relationships as opposed to others, nor discriminates among those political or religious affiliations that might be revealed. Moreover, the filing requirements do not seek "to expose" first amendment activities "for the sake of exposure," *Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957), or specifically for the purpose of revealing political associations, *Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 558, 83 S.Ct. 889, 899, 9 L.Ed.2d 929 (1963), but rather for the sake of revealing potential financial conflicts of interest or financial indices of corruption, whatever their source.

To establish a first amendment violation in these circumstances, plaintiffs must show that the law would unreasonably inhibit the exercise of their first amendment rights. They failed to demonstrate that "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," *Buckley v. Valeo,* 424 U.S. 1, 69–70, 96 S.Ct. 612, 658, 46 L.Ed.2d 659 (1976) (per curiam), would befall them because of the revelations of protected activity in the form, or that in even a single instance protected activity would be foreclosed.[8] Conceivably, "in some particular situations," where for example a real threat of retaliation would attend a specific disclosure, "vigorous application of [LL 48] might implicate first amendment freedoms"; but on this record "this threat is too remote to raise the issue." *Plante v. Gonzalez, supra,* 575 F.2d at 1132–33; *cf. Buckley v. Valeo, supra,* 424 U.S. at 70, 74, 96 S.Ct. at 659, 661.

## IV.

Plaintiffs' strongest argument for protection is under the fourteenth amendment's guarantee of the substantive liberty interest in privacy.[9] The right to privacy is still

rassment resulting from public access to the forms, could be considered to have denied a filer the "free choice to remain silent." *Id.* at 665, 96 S.Ct. at 1187. But in that event the evidence supplied could not, under *Garrity,* be used against the filer in a criminal prosecution. Thus even in the hypothetical worst case, the rights safeguarded by the fifth amendment would not be lost.

**8.** One plaintiff testified that the form would require him to reveal that he is reimbursed for expenditures he makes in furtherance of fundraising activities for a parochial high school. T. 324–25. He did not suggest, however, that he would terminate his association with the school, or that the underlying fund-raising activity would cease. Similarly, another plaintiff complained that LL 48 would require him to reveal reimbursements received from a fraternal organization of which he is secretary-trea-

surer. T. 270–71. Again, he did not object to publicizing his association with the particular organization, but to publicizing his receipt of funds. Without a showing that a particular financial structure is an "indispensable condition" of protected activity, *cf. Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 588, 100 S.Ct. 2814, 2833, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring); *Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976), that is, that in its absence meaningful exercise of first amendment rights would be foreclosed, an incidental impact on such a structure is not proscribed. *See also* T. 270–71.

**9.** The opinions of some Justices support plaintiffs' assertion that the ninth amendment provides constitutional privacy protection. *See Griswold v. Connecticut,* 381 U.S. 479, 486–99, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); *see also* Redlich,

undefined. *Whalen v. Roe,* 429 U.S. 589, 598–99 & nn. 23, 24, 97 S.Ct. 869, 876 & nn. 23, 24, 51 L.Ed.2d 64 (1977). *See generally,* Fried, *Privacy,* 77 Yale L.J. 475 (1968); Gerety, *Redefining Privacy,* 12 Harv.C.R.–C.L. L.Rev. 234 (1977); Kurland, *The Private I,* University of Chicago Magazine 7, 8 (autumn 1976); Parker, *A Definition of Privacy,* 27 Rutgers L.Rev. 275 (1974); Posner, *The Right of Privacy,* 12 Ga.L.Rev. 393 (1978). But it clearly protects "two different kinds of interests.... One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe, supra,* 429 U.S. at 598–600, 97 S.Ct. at 875–877. Those two interests have been labeled interests in "confidentiality" and "autonomy." *Plante v. Gonzalez, supra,* 575 F.2d at 1128.

The autonomy branch of privacy, the more developed of the two, creates a zone of freedom from government restrictions on personal choice in "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). Cases involving government regulation of these matters establish that such laws must satisfy exacting judicial scrutiny. *See, e.g., Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion); *Roe v. Wade,* 410 U.S. 113, 155–56, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973).

In *Plante v. Gonzalez,* the Fifth Circuit held that "[f]inancial privacy is not within the autonomy branch of the right to privacy." 575 F.2d at 1132; *accord O'Brien v. DiGrazia,* 544 F.2d 543, 545 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Financial regulation is widespread in this society, and its direct

effects make the "indirect effects caused by financial disclosure pale by comparison." 575 F.2d at 1131. While noting the Supreme Court's recognition in *Buckley v. Valeo,* 424 U.S. 1, 66, 96 S.Ct. 612, 657, 46 L.Ed.2d 659 (1976), that financial transactions can reveal much about a person's activities, associations, and beliefs, the Fifth Circuit in *Plante* found that personal finances cannot "be protected as incident to protection of the family.... There is no doubt that financial disclosure may affect a family, but the same can be said of any government action .... [A]ny influence does not rise to the level of a constitutional problem." 575 F.2d at 1131.

The analysis in *Plante* of the autonomy branch as it relates to financial disclosure is unassailable to the extent that it finds no "presumptive immunity from regulation" for financial affairs. Henkin, *Privacy and Autonomy,* 74 Colum.L.Rev. 1410, 1411 (1974). The autonomy cases do not rest on what Professor Henkin calls "hard-core privacy," or what people commonly mean by privacy. Regulation of marital affairs, or what one chooses to read, or how one wants to raise one's children, is suspect because of the matters sought to be controlled, not because the regulations intrude into bedrooms, minds, or bodies. *Id.* at 1424–25. "Financial affairs" in general has never been regarded under our Constitution as an area of life that in itself is so fundamental to liberty that regulation is automatically deemed suspect. Such regulation is squarely within the police power, and as an abstract proposition is if anything presumptively valid.

Financial disclosure may nevertheless substantially, albeit indirectly, affect recognized autonomy interests. The characterization—"financial" privacy—should not be permitted, by verbal trick, to relegate substantial autonomy claims to the constitutional status reserved for "economic prob-

*Are There "Certain Rights . . . Retained by the People"?,* 37 N.Y.U.L.Rev. 787 (1962). None of the cases or academic sources written after Justice Goldberg's *Griswold* concurrence suggest, however, that the contours of ninth amendment privacy protection are any greater than the privacy protection offered by the fourteenth amendment, as firmly established in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

lems, business affairs, or social conditions." *See Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965). Financial privacy is not an "economic" as opposed to a "personal" right. Financial facts are sometimes protected under the Constitution for essentially the same reasons that homes are protected—not because finances are "property," but because protecting financial affairs is in some situations a necessary means for protecting the very "personal" right of privacy. *See Nixon v. Administrator of General Services, supra,* 433 U.S. at 529, 97 S.Ct. at 2833 (Burger, C.J., dissenting) (privacy of "purely private matters of family, property, investments, diaries" is interest of the highest order). Therefore, even though the adverse effects of government action on financial privacy are ordinarily insufficient to justify invoking a presumptive immunity, *but see* Comment, *Privacy Limits On Financial Disclosure Laws: Pruning Plante v. Gonzalez,* 54 N.Y.U.L.Rev. 601, 613–16 (1979), a court must still decide in each case what significance to give those effects. Autonomy and confidentiality interests are sometimes simultaneously affected, as in this case, and must be simultaneously considered, albeit by a less exacting standard than strict scrutiny. Neither should be disregarded because of a mechanical application of current, bifurcated privacy doctrine.

The right to privacy's confidentiality branch is "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe, supra,* 429 U.S. at 599, 97 S.Ct. at 876. Protection for legitimate expectations of privacy is premised on concern about harms caused by their violation. *See California Bankers Ass'n v. Shultz, supra,* 416 U.S. at 78–79, 94 S.Ct. at 1525 (Powell, J., concurring); *City of Carmel-by-the-Sea v. Young,* 2 Cal.3d 259, 270, 85 Cal.Rptr. 1, 9, 466 P.2d 225, 233 (1970). But, as Judge Wisdom said in *Plante v. Gonzalez, supra,* 575 F.2d at 1135, "[w]hen a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages. Privacy of personal matters is an interest in and of itself, protected constitutionally . . . . "

The Supreme Court has on two occasions expressly considered the confidentiality branch of privacy. In *Whalen v. Roe, supra,* the Court upheld New York State's prescription drug reporting requirements. The Court did not establish a standard to be applied to the interest in avoiding public disclosure of personal matters, because it was persuaded that the law did not on its face pose "a sufficiently grievous threat to [the] interest to establish a constitutional violation." 429 U.S. at 600, 97 S.Ct. at 877. The statute did not make the disclosed personal information available to the public, but rather carefully limited access to authorized state employees under a strict duty to keep it confidential. *Id.* at 597, 97 S.Ct. at 875. Further, the law provided for destruction of the records after five years. *Id.* at 593, 97 S.Ct. at 873. In essence, the law did not affect a reasonable expectation of privacy, because limited disclosure of potentially embarrassing medical information is "often an essential part of modern medical practice." *Id.* at 602, 97 S.Ct. at 877. The disclosures mandated differed little "from a host of other unpleasant invasions of privacy that are associated with many facets of health care." *Id.; see id.* at 607, 97 S.Ct. at 880 (Brennan, J., concurring).

Any doubt about the constitutional standing of the interest in avoiding disclosure of personal matters remaining after *Whalen v. Roe, supra, see id.* at 608–09, 97 S.Ct. at 881 (Stewart, J., concurring) (arguing that prior cases do not recognize the right), was removed by *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). In *Nixon,* the former President challenged the Presidential Recordings and Materials Preservation Act, which provided for the disposition of great numbers of documents and tape recordings amassed during his presidency. Comingled among many official documents in which Mr. Nixon conceded he had no privacy interest were a comparatively small number of his private communications and his wife's private files. *Id.* at 459, 97 S.Ct. at 2798. The Act and implementing regulations provided that professional archivists

would examine all the materials, remove and return to the plaintiff all private matters, and preserve the official documents for the government and the public. The Court determined that Mr. Nixon, unlike the *Whalen* plaintiffs, had "a legitimate expectation of privacy" in some of the materials, *id.* at 465, 97 S.Ct. at 2801, and instead of employing the "rational basis" standard, appropriate where no constitutionally protected right is at issue, the Court balanced the interests involved and upheld the law. The public interest in preserving the public documents was "important"; the screening was "essential" if the public documents were to be preserved and Mr. Nixon's privacy respected; the personal items would not be available to the public; and the government archivists' record for discretion was "unblemished." *Id.* at 455–65, 97 S.Ct. at 2796.

■ *Whalen* and *Nixon* make reasonably clear that actions affecting the confidentiality strand of privacy are subject to judicial scrutiny more exacting than "rational basis" review, though the precise standard of review remains a subject of dispute. Some state courts have applied variants of the "strict scrutiny" test to such statutes. *E.g., City of Carmel-by-the-Sea v. Young, supra.* Plaintiffs, although labeling it a "balancing analysis," *Slevin* Plaintiffs' Post-Trial Memorandum at 82, argue for strict scrutiny, claiming that to be constitutional LL 48 must "promote a compelling state interest and be the means to accomplish that purpose that is least intrusive of the constitutionally-protected interest." *Id.* at 76. This approach seems inappropriate in reviewing statutes for breach-of-confidentiality claims. As Judge Wisdom stated for the Fifth Circuit:

In equal protection cases the Supreme Court has warned against giving heightened attention to cases involving new "fundamental interests." The Court has avoided proclaiming such a standard in the two cases raising the [confidentiality branch of privacy] issue in which it issued opinions, *Whalen v. Roe* and *Nixon v. Administrator of General Services.* It

has dismissed for want of a substantial federal question three cases raising the question in financial disclosure contexts.... Subjecting financial disclosure laws to the same scrutiny accorded laws impinging on autonomy rights, such as marriage, contraception, and abortion, would draw into question many common forms of regulations, involving disclosure to the public and disclosure to government bodies.

At the same time, scrutiny is necessary. The Supreme Court has clearly recognized that the privacy of one's personal affairs is protected by the Constitution. Something more than mere rationality must be demonstrated. Otherwise, public disclosure requirements ... could be extended to anyone, in any situation.

*Plante v. Gonzalez, supra,* 575 F.2d at 1134 (citations omitted). *But see Whalen v. Roe, supra,* 429 U.S. at 606, 97 S.Ct. at 879 (Brennan, J., concurring) ("Broad dissemination by state officials of [personal] information ... would presumably be justified only by compelling state interests.")

Virtually every court considering the question has, at least nominally, applied some form of intermediate scrutiny. *Nixon* appears to use a balancing approach, 433 U.S. at 456–57, 97 S.Ct. at 2796, as defendants concede most lower courts have done. Defendants' Post-Trial Memorandum at 50. *See, e.g., Stein v. Howlett, supra,* 289 N.E.2d at 413; *Illinois State Employees Ass'n v. Walker,* 57 Ill.2d 512, 315 N.E.2d 9, 15, *cert. denied,* 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 656 (1974); *Montgomery County v. Walsh, supra; Hunter v. City of New York, supra.* In *Plante v. Gonzalez, supra,* and in *Duplantier v. United States,* 606 F.2d 654 (5th Cir.1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981) the Fifth Circuit found that challenges to financial disclosure laws require courts to apply a balancing test "to determine whether the legitimate governmental interests furthered ... outweigh [the] incidental intrusion upon plaintiffs' privacy." *Duplantier v. United States,* 606 F.2d at 670. Both *Plante* and *Duplantier,* however, also suggested a similar but potentially more re-

strictive test requiring that such laws "substantially further important governmental interests." *Duplantier,* 606 F.2d at 672; *see Plante,* 575 F.2d at 1134. The propriety of such a test is supported by its close relation to the approach adopted by the Supreme Court in so-called "middle tier" equal protection cases. *See Plyler v. Doe,* —— U.S. ——, —— & n. 16, 102 S.Ct. 2382, 2395 & n. 16, 72 L.Ed.2d 786 (1982) (education restrictions based on illegal alien status); *Lalli v. Lalli,* 439 U.S. 259, 275–76, 99 S.Ct. 518, 528, 58 L.Ed.2d 503 (1978) (classifications based on alienage); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976) (classifications based on sex).

This case, however, does not turn on what precise intermediate standard of protection is applied to LL 48. To the extent LL 48 orders disclosure by the plaintiff groups to the City government, it would be upheld under the most stringent standard conceivable for such a financial disclosure statute; it easily satisfies the balancing approach suggested by *Nixon,* and applied in *Plante* and *Duplantier.* On the other hand, to the extent LL 48 provides for disclosure to the public of all information collected from the plaintiff groups, limited only by the statute's "privacy" mechanism, it fails to satisfy any standard of review other than on an improperly "toothless" application of "mere rationality." *See Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976).

### A. *Disclosure to the City Government*

■ LL 48 prescribes a two-step process. First, each individual covered by the law must file a disclosure form with the City Clerk. Second, the Clerk is to make the forms available to members of the public, subject only to the privacy mechanism. The evidence established that autonomy and confidentiality interests will be somewhat affected by the filing requirement, but that governmental interests in deterring and detecting conflicts of interest and venality will be furthered sufficiently to justify that requirement.

Plaintiffs concede that in-house procedures in both the Fire and Police Departments already provide the City access to all the financial information required of them by LL 48. T. 525; T.D. 68. This is not a case like *American Federation of Government Employees v. Schlesinger,* 443 F.Supp. 431 (D.D.C.1978), where even though disclosures would not be made public they trenched on substantial first amendment interests. Nor does it resemble *Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D. Pa.1979), where mandatory in-house disclosure of a police officer's relationship with a paramour was held to intrude upon the zone of privacy secure even from a government employer. Rather, as in *Whalen v. Roe, supra,* 429 U.S. at 593, 97 S.Ct. at 873, and *O'Brien v. DiGrazia, supra,* 544 F.2d at 546, the filing requirement, accompanied by access limited to government investigators, would not substantially alter the status quo and therefore would not offend a substantial interest in confidentiality.

Nor will the filing requirement, coupled with government access to the forms, have a significant impact on recognized autonomy interests. Plaintiffs presented evidence that LL 48 will prevent them from making certain choices about how to structure their family life. Specifically, they established that some employee plaintiffs choose to keep their financial affairs secret from their spouses, their children, or members of their extended family. T. 272–82. Similarly, some spouses choose to keep their financial affairs secret from the spouse who would have to file. T. 280–83. Plaintiffs failed to establish, however, that filing or government access to the forms will in any way affect employee choice to keep financial information from family members. Children, other family members, and even spouses need not have access to the forms prior to filing, since only the employee must verify and sign the form. Family members could acquire the information only as a result of the public disclosure provisions.

Filing will necessarily compromise a spouse's desire to keep secret his or her finances from the filing employee, and no provision is made in the law for separate

filing by the spouse. Indeed, the employee, as the filer, must attest to the accuracy of the information relating to the spouse's earnings, holdings, debts, and so forth. But this interest, though substantial in some families,[10] is insufficient to invalidate the filing requirement, either in its entirety or only insofar as it applies to spouses. Although one spouse testified that the requirement would "strain" her marriage, no evidence suggested that it would significantly affect the decisions whether to marry, whether and when to procreate, or other family decisions heretofore held protected by the autonomy branch.

Plaintiffs sought to prove at trial that the disclosure required by LL 48 would serve no useful purpose. Like LL 1 before it, LL 48 contains no declaration of policy. But, as the Appellate Division said in *Hunt-*

*er v. City of New York, supra,* 58 A.D.2d at 137, 396 N.Y.S.2d at 187, "the object of this ordinance is clear: to discourage and detect corruption and the appearance of corruption, avoid conflicts of interest and instill in the public a sense of confidence in the integrity and impartiality of its public servants." Plaintiffs sought to negate these as valid purposes by proving that no corruption has been shown to have occurred in living or recorded memory within the ranks of Fire Department plaintiffs and among Police Surgeons; furthermore, opportunities for corruption among these groups of plaintiffs are limited.[11] Some government witnesses asserted that opportunities existed for Deputy and Battalion Chiefs to engage in corruption or to have conflicts of interests, *see, e.g.,* T.D. 20–31, 45, particularly with respect to their supervision of

---

**10.** Professor Allan Westin, an expert witness, testified:

> [T]he boundaries of information between husband and wife are extraordinarily subtle and sensitive, especially at a time when women, and rightfully so, are having independent careers and independent income .... [N]ow you often have two working partners, each with their monies and making decisions about what they disclose .... [Requiring spouses to disclose their financial affairs to employee filers] raises very serious questions of family privacy and of spousal privacy and threatens the balances that have to be set very sensitively inside families....

T. 186.

**11.** The offices of Fire Department Deputy Chief, Battalion Chief, and Medical Officer, have a virtually corruption-free history. T. 20–22, 64–65; T.D. 78, 82, 87, 152 Officers employed in these positions have little or no contact with the public. T. 39–46, T.D. 58. Deputy and Battalion Chiefs principally perform line duties, supervising their fire companies and on-site firefighting activities. T. 22, 215–19, 266, 323. Their duties do not involve policymaking, and provide no significant opportunities for venality or conflict of interest. T. 25–31, 39–46, 54, 68, 95, 215–19, 222, 266, 288, 290–91, 323, 582–84, 590–95; T.D. 19–152. All of their duties are performed in the company of at least one aide, and often of several. Chief Officers rarely, if ever, pass on a matter that has not first been acted and reported upon by several other members of the Fire Department. Because tours of duty rotate, a matter passed on by one Chief Officer will often later come to the attention of another officer of the same rank; and all matters are routinely reviewed by superior officers. Consequently, a high risk of ex-

posure attends the limited opportunities for corruption Chief Officers may have. Evidence presented by the City reveals that only six of the approximately 400 Deputy and Battalion Chiefs have duties that present them with any significant opportunity for corruption or conflict of interest. These individuals are easily identified by job description. T.D. 50–56. With the possible exception of these six individuals, policy in the Fire Department is set by the Commissioner and his immediate staff, none of whom is in a plaintiff class. Fire Department Medical Officers also have virtually no opportunity for corruption. Their principal duty is administering medical treatment to firemen injured in the line of duty, and determining an injured fireman's fitness for duty. They have no policymaking responsibilities. Rotation of tours of duty makes it highly improbable that any injured fireman will ever be seen twice in succession by the same Medical Officer. Although Medical Officers file the first report with respect to pension eligibility of injured firemen, it is impossible for a Medical Officer acting alone to falsify a pension claim, given the administrative framework governing pensions. T. 64–70, 288–91; T.D. 38–42, 82.

Police Department Surgeons have few, if any, opportunities for corruption. T. 581–84. Fire Inspector Kotch testified that a Medical Officer could not falsify a pension claim, T.D. 137, the only area suggested by defendants to present Medical Officers opportunities for corruption. Defendants presented no credible evidence that Police Surgeons are differently situated. Their only witness on the subject was patently ignorant of the surgeons' responsibilities and opportunities for corruption. T. 590–95.

inspections. Plaintiffs discredited much of this testimony, T.D. 50–56, 58, and presented credible testimony to the contrary, see T. 39–46, 54. Given Fire Inspector General Kotch's agreement that "[t]here is ... no proof whatsoever of a single instance of active corruption or conflict of interest activity by a Chief Officer," T.D. 152, plaintiffs' evidence is far more credible. Corruption in the ranks of Police Captains and Lieutenants has often been demonstrated, and opportunities for corruption exist among these groups.[12] Plaintiffs proved, though, that corruption among such police officers is much less frequent than in the lower ranks; that procedures already in place in the Departments serve the deterrent and detection purposes of the law; and that internal procedures are more effective than employee disclosure, because they do not depend upon employee compliance and forms that may well be little used by investigators, see T. 589.

Investigators charged with policing the integrity of employees in both the Fire and Police Departments credibly testified, however, that governmental access to the information secured by LL 48 would be of some help to them in discharging their duties, and would serve to deter conflicts of interest. T. 586, 632; T.D. 44, 99, 184–91. Corruption and more subtle conflicts of interest are possible in each group of plaintiff employees. That no corruption has been proved among several groups of plaintiffs does not establish that improprieties have never occurred, or would never be deterred or uncovered by the filings. Inspector General Kotch expressed the view that ample opportunities for corruption exist among Batallion and Deputy Chiefs. T.D. 20–29. John Guido, Chief of the Inspectional Services Bureau of the Police Department, described how the City's Narcotics Division was long regarded as the best squad of detectives until the Knapp Investigation put some 60 of its 80 members behind bars. T. 576–77. The City is not required to rely, moreover, on departmental mechanisms to achieve its aims; it is entitled to opt for a centralized system of monitoring its employees' finances, even if the new procedure is less comprehensive than some departmental procedures. The extent to which the new system will be used, or will prove useful, is speculative. Yet, the fact that dishonest filers may lie on the forms seems likely to prove a useful aspect of the system. Experience has shown that prosecuting individuals for false statements in required filings is often more efficient and successful than prosecuting them for the misconduct or imprioriety they sought to hide; and in prosecutions for the underlying conduct, proof that the subject lied or withheld information is often potent evidence, especially as to the individual's intent.

If the centralized disclosure procedure mandated by LL 48 serves valid governmental objectives, then requiring information about spousal finances is necessary to make it effective. As the First Circuit stated in *O'Brien v. DiGrazia,* 544 F.2d 543, 546 (1st Cir.1976), "[i]nformation about other members of the officer's household must also be revealed if the questionnaire is to have meaning." *See* T. 361, 376–79. Virtually every financial disclosure law enacted to date has required some disclosure of family finances. *See supra,* note 1. "[A]s a basic proposition, resources of a husband and wife are usually held in common, and the financial interests of a spouse are generally shared by the partner. A bookkeeping arrangement wherein one spouse holds sole title to a particular financial asset does not mean that the partner does not share an interest in the financial holding...."

---

**12.** Evidence established that the New York City Police Department, including the titles of Captain and Lieutenant, has a history of pervasive corruption. T. 560; Defendant's Exhibit L, The Knapp Commission Report on Police Corruption (1972) ("Report"). Substantial opportunities for conflict of interest and corruption inhere in many of these jobs. T. 543–66, 572– 74, 580, 611; Report at 61–71. In recent years, corruption in the Department, and among Captains and Lieutenants, has markedly diminished, but it persists. T. 540, 562–63, 614. Police Captains and Lieutenants have primarily administrative functions, supervising police activities at the precinct level. T. 614–19.

House Select Comm. on Ethics, Legislative Branch Disclosure Act of 1977, H.R.Rep. No. 574, 95th Cong., 1st Sess. 23 (1977). "Failure to require disclosure of the financial holdings of a spouse ... would render [LL 48] meaningless," because a filer "who wished to evade the financial reporting requirements of the law could easily funnel money and property to his or her spouse...." *Id.* at 24 (citation omitted). These considerations justify the City Council's inclusion of spousal finances in the filing requirements of LL 48, despite the desire of some spouses to keep their finances. secret from the filing employee.[13] Moreover, the required disclosure of spousal information to the filing spouse serves yet another purpose that seems compelling. It effectively requires the filing spouse to make himself or herself familiar with the nonfiling spouse's interests, and thereby become responsible for avoiding conduct that could improperly favor the nonfiling spouse's interests.

### B. *Disclosure to the Public*

[13] The aspect of LL 48 that permits public access to all financial information filed by employees must be evaluated separately from the law's requirement that the forms be filed with the City. Public access to the information that must be filed under LL 48 would have a very substantial impact on the confidentiality aspect of privacy, as well as significant indirect effects upon recognized autonomy interests. Furthermore, the government has no need for such burdensome disclosure. Any legitimate need for public access—including press access—is served here by applying the statute to employees who are elected or hold policymaking positions. The plaintiff classes are, without exception, categories of civil servants appointed and promoted on the basis of competitive tests, who have no important policymaking authority. The public disclosure provision thus deprives plaintiffs of important rights while furthering no substantial interest.

#### 1. *Impact on privacy of public disclosure*

The degree of intrusion stemming from public exposure of the details of a person's life is exponentially greater than disclosure to government officials. *See Nixon v. Administrator of General Services, supra,* 433 U.S. at 458, 97 S.Ct. at 2797; *Whalen v. Roe, supra,* 429 U.S. at 600–02, 97 S.Ct. at 877; *Planned Parenthood v. Danforth,* 428 U.S. 52, 80–81, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788 (1976); *O'Brien v. DiGrazia, supra,* 544 F.2d at 546. Disclosure to the government necessarily results in fewer persons learning of the facts disclosed than does public disclosure, which potentially reaches everyone. Disclosure to the government serves identifiable needs that limit both the persons to whom disclosure is made and the purposes for which they may use the information disclosed. By contrast, even if public disclosure is seen to serve identifiable needs, those needs do not limit the persons to whom, or the purposes for which, disclosure is made. Any person may obtain and use publicly disclosed information, and for any purpose, however improper. Government officials generally lack familiarity with a particular employee's privacy concerns, and are constrained in using private information by legal, ethical, and practical considerations, including the need to avoid harming employee morale. Public disclosure will provide access to individuals particularly interested in the filer's privacy concerns, as well as to the press and other commercial interests bent on exploiting the information and relatively unconstrained in doing so. The mere fact that private information is available on demand to individuals who know what is sensitive and how to exploit it adds greatly to the inhibition, anxiety, and embarrassment that the same

---

**13.** One potential problem arising from LL 48 is that the filer might be liable for failure to file a complete return if his or her spouse refused to supply the necessary information. Serious constitutional problems would be raised by a prosecution under such circumstances, and perhaps even by any punishment such as discharge. The City or the State courts may, however, read into the law a "good faith effort" excuse for an employee's failure to provide spousal information. *See* Report of the Select Committee on Ethics, *supra,* at 24.

disclosure might cause if restricted to the government. T. 104–111, 243.

Plaintiffs presented several examples of how public disclosure would adversely affect autonomy interests, particularly the recognized interest in controlling one's family life. An individual (or his spouse) wanting to project an image of modest financial means could be exposed as having substantial wealth. Other filers would be unable to avoid exposing their relative impecunity. Exposure of "the truth" could prevent filers and their spouses from choosing life styles that they believe to be beneficial to themselves or to their children. T. 238–41. Given the broad scope of disclosure ordered by LL 48, moreover, public filings will reveal in some instances facts that could damage a variety of associations and relationships, ranging from family relationships to friendships and participation in fraternal and religious activities. *See, e.g.,* T. 239–45, 272–82. Nor is it possible to know in advance the many effects of public disclosure upon the filer's autonomy interests. For example, while the requirement that a filer reveal the address of certain real property he or she owns primarily affects a confidentiality interest, filers will have to avoid owning homes if they wish to avoid revealing their residence or summer addresses.

Public disclosure will directly and materially affect the confidentiality interests of filers and their spouses. Among those likely to use the forms are insurance salesmen seeking customers, T. 423, family members or neighbors seeking knowledge of the filer's financial capacity for a variety of purposes, T. 272–77, former spouses seeking to determine ability to pay alimony, T. 427, business organizations seeking investors or customers, public interest or other charitable organizations seeking contributions, and commercial interests seeking to expand mailing lists, T. 143. As noted above, public disclosure may lead to embarrassment that one lives above or below one's means, and will reveal many associations. The impact will be felt with respect to the disclosure of virtually every class of financial information specified on LL 48—sources of outside income, *e.g.,* T. 295, 345, gifts and reim-

bursements, *e.g.,* T. 325, amount and address of real property, *e.g.,* T. 551; T.D. 178–79, identity of creditors and amount of debt.

Filers will also lose the power to minimize specific and reasonable fears for their own safety, their family's safety, and the security of their property. T. 327–28, 532; T.D. 178–79. Police officers are particularly concerned that their home addresses must be revealed, if they own homes, thereby exposing themselves and their families to possible attack by criminals whom they investigate, apprehend, or testify against. T. 327–28, 434–35, 456, 532. A government investigator called by the defense to support the need for LL 48 confirmed that policemen commonly take extreme measures to keep their addresses private; he said that he, too, would be reluctant to make his address available to individuals whom he had helped send to prison. T.D. 178–79. The law also directs the City Clerk to retain the forms until two years after the employee leaves public service; public exposure is thereby potentially extended over decades, increasing the risk of intrusions and the resulting anxiety. T. 243.

The press seems most likely to examine disclosures, and to use the information in newspapers, television, and radio stories. *See* T. 490 (experience in Alabama indicates press is a principal user of disclosed information). Uncontroverted testimony indicated that on several occasions the New York press used financial information about police and fire officers in humorous or ridiculing articles about the officers or their spouses, occasionally with painful consequences to the individuals concerned. T. 84, 139–40, 244, 305, 426, 428–31, 489, 528–29, 534; T.D. 203–04 (testimony of Inspector Kotch). Press exposure of private facts is perhaps the single most persistent danger to the privacy of Americans. The right to privacy has from its inception reflected a desire to protect sensitive, personal information from an intrusive and sensationalist press. *See* Warren & Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890); Note, *The Right to Privacy in Nineteenth Centu-*

*ry America,* 94 Harv.L.Rev. 1892 (1981). Our nation's free and vigorous press, however, will not and must not be restrained in the lawful pursuit of even the most tasteless aims. Consequently, any protection to be afforded civil servants from press exposure having no legitimate public purpose must take the form of protecting private material from required public disclosure. *Cf. New York Times Co. v. United States,* 403 U.S. 713, 728–30, 91 S.Ct. 2140, 2148, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring) (national security best preserved by avoiding disclosures, not by imposing restraints on press).

Defendants argue that the privacy interests affected by LL 48 are adequately protected by the statute's mechanism for permitting individuals to apply for protection of private information. That mechanism, however, will not prevent, and in some ways will exacerbate, invasions of legitimate expectations of privacy.

LL 48 requires that all information specified on the form be supplied in full, regardless of whether the individual filing considers the information to be private. The filer must flag each item he considers to be private, and must provide to the City a full explanation, in writing, of why "the item is of a highly personal nature." His privacy claims will not be adjudicated, moreover, until a request for public inspection is made of the City Clerk; the claims may therefore have to be repeated each year, for years, before they are actually adjudicated. When the privacy claim is adjudicated, the ordinance provides three factors for the Board of Ethics to consider: "(a) whether the item is of a highly personal nature; (b) whether the item in any way relates to the duties of the positions held by such person; (c) whether the item involves an actual or potential conflict of interest." The Board is to make its determination in writing, and to forward it to the City Clerk, who is then to make available all information but that which the Board has excepted.

The standards provided to the Board of Ethics afford no assurance that requests by filers to keep information private will be granted, even when no need exists for public disclosure. The evidence demonstrates that plaintiffs harbor expectations of privacy for a variety of reasons that may be strongly felt but are unlikely to be deemed "highly personal." A father's wish to bring up his children without letting them know he is relatively wealthy, for example, or a filer's desire to avoid being solicited by salesmen, may not be deemed "highly personal." If so, disclosure follows automatically even though the information involved, such as the precise amount of a person's assets or his home address, has nothing to do with the filer's duties and poses no threat of conflict of interest.

Whatever value the statutory mechanism may have is negated by the indefinite delay that occurs before a claim of privacy is resolved. The Board of Ethics rules upon such claims only after a member of the public seeks to inspect the filing of the employee seeking protection against public disclosure. The filer therefore will not know whether details about himself or his spouse will be protected or exposed to the public until a request for inspection is made, and the Board of Ethics rules. During that period of uncertainty, the filer and his spouse must live with the continuing possibility of public disclosure. As Dr. Levin testified:

> If a person fills out this form, immediately there is a fear that there may be disclosure at some future time, some unknown time, [by] some unknown person, and one begins to limit the choices, the behavioral choices. One might change the way they reared their children, perhaps someone believes that children should not know that one is wealthy and want them to develop self-reliance, and then that freedom would be limited. It could be the other way: someone could have had a very difficult life, worked very hard, his parents were very poor and he wanted his children not to know that they really had very little money and not to have that stress. You would no longer have that freedom because you certainly want to appear trustworthy to your chil-

dren. So that the kind of choices you would make would be limited.

T. 242–43; *see* T. 173–75 (testimony of Dr. Westin). The statutory mechanism does nothing to allay the anxiety caused by loss of control over, and indeed loss of knowledge about, what information will eventually be communicated to the public. T. 104 (testimony of Dr. Westin); T. 243 (testimony of Dr. Levin). In Dr. Westin's words, the mechanism would have plaintiffs "wondering day by day whether somebody will ask for this and not knowing in advance whether the Ethics Board will accept or reject their [privacy] claim until the moment at which they are placed in jeopardy." T. 175.

Furthermore, the requirement that employees detail in writing their privacy claims will in many cases condition the opportunity to avoid one invasion of privacy on accepting a second, even more intrusive invasion. The reasons financial information may be private or personally embarrassing will almost always be more personal and private than the information itself. *See* T. 175. "Moreover, all privacy claims must be decided in writing, and a person losing a privacy claim will be forced to litigate or (unless regulations are adopted providing otherwise) suffer the revelation of both the information and the fact that the privacy claim was rejected." *Slevin v. City of New York,* 477 F.Supp. 1051, 1058 (S.D.N.Y.1979).

Finally, the privacy mechanism of LL 48 has the effect of placing in special jeopardy persons who succeed in obtaining protection from disclosure of particular items:

> Since their reports will be publicly available except for material deemed protected, the public will be placed on notice that [a specific] aspect of the financial lives of these individuals is "highly personal." That the aspect of their lives that is withheld will have been found to have no relationship to their duties, or to raise no actual or potential conflict of interest, seems unlikely to guaranty that no effort will be made by members of the public to discover the underlying facts. Indeed,

some investigators may be more interested in uncovering non-job related "highly personal" facts than in examining less intensely personal information, however job related.

*Slevin v. City of New York,* 477 F.Supp. at 1058. The "privacy mechanism" will therefore have the effect of flagging "highly personal" aspects of a person's life to the public, thereby inviting focused intrusions by the press. The threat of public disclosure of the specific areas of an individual's life that involve highly personal matters seems an especially grave invasion of privacy, and further limits the utility and significance of the privacy mechanism.

### 2. Need for public disclosure under LL 48

Public exposure of the financial affairs of public officials, candidates for elective offices, and government employees may serve important legislative goals. Our national, state, and local governments rely upon voter participation concerning numerous subjects. The public acts as a legislature in some circumstances, voting in referenda on various issues. In these instances, legislatures are justified in mandating public disclosure of all the information a legislature would need to know. The public also votes to elect persons to executive, legislative, judicial, and administrative offices, at all levels of government. A legislature acts reasonably in mandating public disclosure of information necessary or even arguably helpful to the elective process, including information about the individuals seeking office. The essence of elective office "consists in putting before the voters every conceivable aspect of [one's] public and private life ...." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 274, 91 S.Ct. 621, 626, 28 L.Ed.2d 35 (1971). Public disclosure under LL 48 expressly applies to the Mayor, members of the City Council, the Comptroller, the Borough Presidents, and candidates for those offices. But the financial information sought from the plaintiff classes is neither necessary nor relevant to any identified, public legislative function, and no member of the plaintiff classes is an elected official.

The public's need to know extends beyond the vast disclosures justifiable by the public's law-making and voting functions. The City argues that public confidence in the integrity of fire and police officers could be increased by public disclosure pursuant to LL 48, because the public (including the press) could thereby monitor and investigate corruption and conflicts of interest, and because of the belief that disclosure will deter the officers covered by LL 48 from corrupt or unethical acts. The City contends, more broadly, that public disclosure is justified as to employees who earn more than $30,000, because the public has a special interest in its own employees, particularly those with relatively high salaries. "Salary is directly related to the importance of the functions of the employee and of the degree of reliance which is placed upon the integrity of their discharge, even though there are other parameters. Thus a measure of the danger posed by the opportunity to exercise a conflicting interest is furnished by the salary of the position." Defendants' Post Trial Memorandum at 8. Finally, and most broadly, the City claims that public disclosure under LL 48 increases the public's knowledge of matters relevant to government, and is therefore supported by the public's "right to know" of matters that make for an informed citizenry. None of these grounds provides substantial justification for public disclosure of the financial facts of plaintiffs' lives.

### a. Need to control corruption and conflicts of interests.

The suggestion that the public will investigate corruption or conflicts of interest among civil servants such as plaintiffs has no evidentiary basis; while the press frequently focuses on the activities and ethics of elected and policymaking officials, the task of investigating civil servants is generally one delegated to and carried on by government personnel. The relevant question, with respect to the possibility of increased exposure of improprieties or increased deterrence, is not whether public disclosure will expose or deter conflicts of interest, but whether it will expose or deter

significantly more effectively than disclosure to the government. Furthermore, that judgment must be made in the proven context of a City whose employees are separately governed by an array of laws and procedures designed to prevent and deter corruption and conflicts. See Slevin Plaintiffs' Memorandum of Law at 23–24 (statutes collected).

The City made no attempt at trial to establish that public disclosure of the information secured from plaintiffs by LL 48 would enhance to any extent the investigation or deterrence of corruption or conflicts. Indeed, the City's principal witnesses explicitly disclaimed any such result. Inspector Guido, the officer in charge of investigating Police Department corruption and conflicts of interest, frankly conceded that the interests in detection, deterrence, and prevention of corruption or conflicts of interest will be fully served by disclosure of the information to his department. T. 627–28. Fire Inspector General Kotch testified to the same effect:

Speaking as an investigator, I would ... say it wouldn't impede me if [the information] was just available to investigative agencies and not to the public; although [I am] aware ... that the Mayor or the City Council may think that the public has a right to such access, fortunately I am not a politician and I don't really have a pulse on what the public wants, nor do I care what the public wants.

T.D. 102; see T.D. 184. Defendants took pains, in fact, to establish the efficiency and adequacy of the City's investigative apparatus. T. 555–59; Defendants' Post-Trial Memorandum at 13.

These concessions cannot be disregarded. They strongly buttress plaintiffs' claim that public disclosure of virtually every aspect of plaintiffs' finances could not conceivably lead to public scrutiny that affects public confidence in government. While certain limited types of information could in connection with some members of the plaintiff classes lead sporadically to investigations

and revelations that serve some public end, the statute goes far beyond requiring disclosure of information bearing upon the workings of government. Rather, LL 48 adopts the technique of systematically, and indiscriminately, ordering disclosure of all the financial facts about every person covered.

### b. *Need for disclosure by higher-paid employees.*

The City seems primarily to rest its case for public disclosure of plaintiffs' finances on the notion that the public has a special interest in knowing about those public employees in jobs entailing a high degree of trust, and that the salary level of $30,000 is a fair "measure of the danger posed by the opportunity to exercise a conflicting interest .... The legislative judgment has been that the threat is significant enough to warrant disclosure at the $30,000 level." Defendants' Post Trial Memorandum at 8.

The notion that the public has a special interest in knowing about public employees who hold positions with a high degree of trust is in principle valid. A tangible and substantial public need to know exists with respect to government employees exercising policymaking functions, not merely for the purpose of uncovering conflicts of interest, but also for the purpose of enabling the public to evaluate the motives and biases that such individuals may possess. Leading administrators in the City's agencies, for example, are called upon to recommend or decide upon actions of great public importance, which decisions might arguably be affected by their financial position or interests. The public, therefore, could conceivably learn relevant facts about the job performance of such individuals by knowing about their finances generally. Some limits may be proper on the public disclosure of facts related to such individuals. But the broad, discretionary powers of policymaking officials make them potentially proper subjects of the complete financial disclosures sought by the City in LL 48.

This basis for public disclosure by policymaking officials does not, however, extend

to public employees in general. Individuals and their families may not fairly be subjected, by virtue of public employment alone, to greater public scrutiny than other citizens. Americans do not lose their right to privacy by accepting public employment. Of course, a particular public employment may provide a legitimate nexus tending to justify public disclosure of otherwise private information. But a need for disclosure must be advanced, not merely the fact of public employment. *See Plante v. Gonzalez, supra,* 575 F.2d at 1134 & n. 25. *Compare City of Carmel-by-the-Sea v. Young, supra,* 85 Cal.Rptr. at 7, 466 P.2d at 232 (indiscriminate application of public disclosure law to all public employees unconstitutional) *with County of Nevada v. MacMillen,* 11 Cal.3d 662, 114 Cal.Rptr. 345, 522 P.2d 1345, 1350 (1974) (application of public disclosure law to high officials constitutional). *Cf. Elrod v. Burns,* 427 U.S. 347, 367–68, 96 S.Ct. 2673, 2686, 49 L.Ed.2d 547 (1976) (plurality opinion) (constitution permits patronage dismissals of policymaking public employees but not of public employees in general).

The evidence demonstrates that policymaking in both the Fire and Police Departments is in the hands of the Mayor's appointees, and their hand-picked professionals in the highest departmental ranks. *See supra,* notes 11 & 12. The officer classes covered by LL 48 are engaged in implementing policy established by others. The Fire Department plaintiffs perform their duties literally in accordance with "the book"—*i.e.,* manuals and instructions that are issued by headquarters to govern their conduct in virtually all contingencies. T. 26–30; *Slevin* Plaintiffs' Proposed Findings of Fact (No. 11) at 5. While the police officers covered by LL 48 have considerable discretion in connection with their tasks, the discretion they exercise involves no general policy implications. T. 614–19. Their discretionary functions potentially subject some of them to the temptations of graft and corruption, but theirs are not the sorts of policymaking activities that make all the fiscal facts of their lives a proper subject of general public scrutiny.

The City seemed initially to argue that at least some members of the plaintiff classes have managerial positions, routinely making policy. *See* Affidavit of Deborah Rothman, Esq., Sept. 21, 1979, ¶ 6. In fact, some Deputy Chiefs in the Fire Department, and some Captains in the Police Department, serve by special assignment in high positions, apparently involving policymaking authority. But LL 48 has no mechanism for requiring only these individuals to disclose, and the City has abandoned any effort to rely upon these assignments as a basis for justifying disclosure by all who earn more than $30,000. The City's post-trial position is that

> the issue of whether the members of plaintiffs' classes are "policy-members" or members of the City's managerial pay-plan, or merely execute the policies of others, is irrelevant and immaterial. It is difficult to conceive of a public employment, other than that confined to purely physical labor, or, in some instances, to tasks which are wholly clerical, in which there is no opportunity to defeat the public interest by a divided loyalty.
>
> It follows therefore that the "managerial" or "policy-making" role of an employee is immaterial to the final validity of the local law. . . . It is not necessary that the employee subject to disclosure be in a position to determine City policy; it is sufficient that he or she is in a position to implement that policy with respect to a significant number of employees.

Defendants' Post-Trial Memorandum at 7 & 36.

The power to implement public policy is certainly a matter that justifies public attention, and it is related as the City contends to the potential for corruption. But it no more justifies across-the-board, public disclosure of finances than does the potential for corruption alone. The economic interests of such persons are irrelevant to all issues other than potential corruption, and the record in this case establishes that public disclosure will not add materially to the investigative or deterrent value obtained by disclosure to the City's investigative agencies. The City's proposed justification would require public disclosure of the finances of public employees who direct a "significant" number of other employees even though they exercise no policymaking authority and little discretion. The mere fact that one serves the public as a supervisor does not, however, make his financial life a valid subject of public scrutiny.

The City also argues that the salary level selected in LL 48 reflects a reasonable legislative judgment that should be enforced even though it might be both overinclusive and underinclusive of the persons whose finances should be disclosed. To support this proposition the City invokes the familiar doctrine that courts must defer to a legislature's decision to draw any reasonable and necessary regulatory line. *See Buckley v. Valeo*, 424 U.S. 1, 83, 103, 96 S.Ct. 612, 665, 675, 46 L.Ed.2d 659 (1976). Deference to a legislature's line-drawing is premised, however, on the particular line's relationship to the statutory purpose, and the lack of any practicable means for fixing the line more precisely. The line chosen by the City Council is only tangentially related to the statute's purposes, and wholly unnecessary.

In *Buckley v. Valeo* the Supreme Court upheld $10-and $100-per-contribution thresholds for campaign contribution record-keeping and reporting requirements. 424 U.S. at 82–83, 96 S.Ct. at 664. It also upheld a requirement that a political party receive at least five percent of the vote in the instant or previous election in order to qualify for general election funding. *Id.* at 103, 96 S.Ct. at 675. These thresholds differed fundamentally, however, from that at issue here. The use of a dollar figure for campaign contributions relates directly to the reasons for requiring disclosure. As the Court said, "[a] public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." *Id.* at 67, 96 S.Ct. at 657. The constitutional challenge therefore was not ·directed at the reasonableness of using a dollar amount as an index of influence, but instead at the dollar level chosen. The

Court said: "The line is necessarily a judgmental decision, best left in the context of this complex litigation to congressional discretion." *Id.* at 83, 96 S.Ct. at 665. Similarly, the requirement that a party receive five percent of the vote in the instant or previous general election in order to qualify for federal funding related directly to the purposes of the legislation. Congress stated a clearly legitimate interest "in not funding hopeless candidacies with large sums of public money," which "necessarily justifies the withholding of public assistance from candidates without significant public support." *Id.* at 96, 96 S.Ct. at 671. The Court found that "popular vote totals in the last election are a proper measure of public support." *Id.* at 99–100, 96 S.Ct. at 673. Again, the challenge was aimed at the percentage figure selected—a choice that the Court said "was for Congress to make," *id.* at 103, 96 S.Ct. at 675—and not at the propriety of using a percentage index to accomplish the stated goal.

In this case, the relationship between salary level and the objectives of a mandatory financial disclosure law is tenuous. The only evidence before the City Council and presented at trial proves that salary is a crude method for determining who will disclose; that the Council knew the $30,000 line was overinclusive in that it included crane operators and others in jobs having no public policymaking functions; and that the Council never determined exactly which jobs would be covered by the $30,000 line.[14] The Council knew also that LL 48 was underinclusive, in that it left unregulated such sensitive, policymaking positions as all members of the Landmarks Preservation Commission, members (other than the Chairman) of the Taxi and Limousine Commission, and employees of the Fire and Police Departments concerning whom the strongest record of corruption exists. *See Slevin* Plaintiffs' Memorandum of Law at 25–26; *Slevin* Plaintiffs' Post-Trial Reply Memorandum 17–22. In fact, the City chose a line that was a mere guess as to the importance and sensitivity of the jobs covered, and by using a dollar amount the City picked a line that will, as salaries rise, automatically extend the coverage of LL 48 to new and unknown sets of employees.

The City's $30,000 threshold is not entitled to judicial deference for the additional reason that it is unnecessary. As Justice Holmes explained, in advocating judicial deference to legislative line-drawing, the

---

**14.** On June 22, 1979, Ms. Carson, an assistant to the Mayor, apparently instrumental in drafting the law, told the Committee preparing it for presentation to the Council that

the use of a dollar figure is probably overinclusive as to some people and underinclusive as to others and we would like to request that the Director of Personnel in conjunction with any other parties who should be interested in this they'll give some attention to whether there are people who are covered by the $30,000 mark who shouldn't be and others who are not covered who ought to be....

City Council Committee on Standards and Ethics, Transcript of Meeting, June 22, 1979, at 6. Ms. Grad, Counsel to the Board of Ethics, indicated later at that meeting that "[w]e think the $30,000 figure is a good way of measuring" employees properly covered. *Id.* at 40. But by July 9, 1979, the day before the Council passed the law, after undertaking a "cursory examination of some titles," City Council Committee on Standards and Ethics, Transcript of Meeting, July 9, 1979, at 11, Ms. Grad had reason to propose an amendment to LL 48 that would deal with the Council's failure to determine what groups were included by that figure and

the law's resulting overinclusiveness. She stated that the Board of Ethics and Corporation Counsel

are very much in favor of this amendment .... [W]e believe that even at the $30,000 threshold, there may be some titles of City employment which are not appropriate for covering and we did not conduct ourselves an examination of all the titles that would be covered but we did look at a few and one example that sticks in my mind is a crane operator who would be covered .... [I]t's not at least apparent on its face that the purposes of the Act would be served by covering crane operators .... [T]his amendment ... would provide the mechanism [by] which an established committee would be able to review the crane operators or what the particular duties of the title were and whether it was appropriate to cover that title and determine whether or not it would be served by that covering and therefore, no public benefit would be achieved in covering then they would have the authority to exclude that title from operation of the Act. *Id.* at 2–3.

reasonableness of arbitrary lines lies in their necessity:

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.

*Louisville Gas & Electric Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (Holmes, J., dissenting); *see Buckley v. Valeo, supra,* 424 U.S. at 83 n. 111, 96 S.Ct. at 665 n. 111.

The record establishes that the City Council had no need to draw an arbitrary line. LL 48 was carefully written to cover all the important elected and policymaking offices in City Government. It expressly applies to the Mayor, City Council President, City Councilmen, Borough Presidents, and Comptroller, and to all candidates for those positions. It also covers all the principal officers of every agency, members of all boards and commissions who serve for pay, and employees covered by the City's managerial pay plan. *See supra,* note 6. Only after covering all these offices does the statute seek to include all employees earning over $30,000. The $30,000 line cannot, therefore, be justified as necessary to include any of the elected or policymaking personnel in City government. To the extent the City Council believed that coverage of offices in addition to those expressly covered was necessary, it could have examined particular job categories and specified which ones were to be covered; or it could have delegated the screening task to the Board of Ethics, an agency already created to deal with conflict-of-interest problems. As the record of the City Council's deliberations demonstrates, the City refused both to do the work itself, or to delegate it.[15] Rather, it simply decided to draw an unnecessary line, only tenuously related to its

---

15. Well over half the final meeting on LL 48 concerned the problem of how to deal with the Committee's ignorance of whom the law would include. The record makes clear that neither the Administration that advanced the legislation nor members of the Committee that approved it made any study of the titles covered. Positions in only two or three of the many City agencies were even briefly reviewed. City Council Committee on Standards and Ethics, Transcript of Meeting, July 9, 1979, at 5. Councilmember Katzman commented at one point:

> I am simply suggesting there are people earning $30,000 a year or more who really aren't in any position, which is one that is of confidentiality or that requires filing of financial disclosure statements.

*Id.* at 10–11. One witness asserted without contradiction by members of the Committee that, one day before LL 48 was passed by the Council, its proponents had no notion whose privacy it would invade and whether there was a rational need for it, *see id.* at 16 (testimony of Mr. Gordon); no one claimed to have endeavored to determine which City employees earned over $30,000 and whether there was reason to require them to disclose, let alone to require that the disclosures be public.

The amendment proposed by the Board of Ethics and the Corporation Counsel, that would have enabled the Board to except employees from coverage by LL 48, *see supra,* note 14, failed because no committee member moved that it be adopted. *Id.* at 24–25. This may have been due in part to the amendment's lack of standards to guide the committee that would rule on exemptions. *See id.* at 19. But opposition also was based on the fear that deliberate consideration of many of the job titles included by the $30,000 line would result in their exemption from coverage. Councilman Stern stated:

> I would like to express my serious concern with the passing of any piece of legislation which then provides in it terms for it being dismantled by allowing first the Committee, Administration officials and subsequently judges to in effect revoke it . . . .

*Id.* at 11. This desire to avoid a broad delegation, to prevent the law from being "dismantled," was entirely proper. But by refusing delegate this task the Committee was then faced with the duty of addressing itself to the law's acknowledged overbreadth. It made no effort to do so, and the Council adopted the law with no further deliberation.

objectives, and in ignorance of the relevant facts. Such a line is entitled to no special deference.

Congress recognized that a fixed, monetary line is neither sensible nor necessary in adopting the Ethics in Government Act of 1978 (the "Act"), Pub.L. No. 95–521, 92 Stat. 1851, which includes the financial disclosure statutes for the three branches of federal government. 2 U.S.C. §§ 701–09 (legislative personnel); 5 U.S.C.App. §§ 201–11 (executive personnel); 28 U.S.C. App. §§ 301–09 (judicial personnel). The Act provides a "comprehensive statute requiring full and complete public financial disclosure by high-level officials in all three branches of Federal government." S.Rep. No. 170, 95th Cong., 2d Sess. 42, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4216, 4258. Congress defined "high-level officials" as certain enumerated officials and all officials attaining pay grade GS–16. The GS–16 grade is the third highest pay grade in a system differentiating salary in part "in proportion to substantial differences in the difficulty, responsibility and qualification requirement, of the work performed." 5 U.S.C. § 5101(1)(B).[16] Congress selected GS–16 as a measure of the official duties covered, moreover, and not as a proxy for a certain salary level. Officials at a lower pay grade who, due to seniority, "earn more money than an employee at GS–16, step 1, will not have to file a financial disclosure statement. It is the level of an ... employee's responsibility, as determined by the grade at which he is classified, rather than the amount of pay, that is the determining factor." S.Rep. No. 170, *supra* at 110, 1978 U.S.Code Cong. & Ad.News at

4326. Congress also adopted this approach to avoid automatically extending coverage as salaries rise. "[T]he rate of compensation for [GS–16] will increase with inflation; thus, [by using GS–16 rather than salary,] more and more employees will not be covered by the public disclosure requirement over the years simply because the amount of money they are paid increases due to inflation." *Id.*

*Nixon v. Administrator of General Services, supra,* and *Whalen v. Roe, supra,* suggest that a similar degree of care is required in drafting all laws that adversely affect privacy. In *Nixon,* the Court emphasized the care taken by Congress in legislating and by the Administrator in establishing regulations for the screening of the presidential papers, 433 U.S. at 452–65, 97 S.Ct. at 2794, and specifically commended "the Act's sensitivity to appellant's legitimate privacy interests," *id.* at 465, 97 S.Ct. at 2801. Similarly, in *Whalen* the Court premised its deference to the legislative judgment underlying the challenged law in part on the ground that it was "a considered attempt" to deal with the drug abuse problem:

> It is manifestly the product of an orderly and rational legislative decision. It was recommended by a specially appointed commission which held extensive hearings on the proposed legislation, and drew on experience with similar programs in other states.

429 U.S. at 597, 97 S.Ct. at 875. Like the statute upheld in *Nixon,* careful and effective "security provisions" foreclosed the possibility of public disclosure, *id.* at 600–02,

---

16. GS–16 includes only positions with the following duties:

(A) to perform, under general administrative direction, with *unusual latitude for the exercise of independent judgment, work of outstanding difficulty and responsibility* along special technical, supervisory, or administrative lines which has demonstrated leadership and exceptional attainments;

(B) to serve as the head of a major organization involving work of comparable level;

(C) *to plan and direct or to plan and execute professional, scientific, technical, administrative, fiscal, or other specialized programs of*

*unusual difficulty, responsibility, and national significance,* requiring extended training and experience which has demonstrated leadership and exceptional attainments in professional, scientific, or technical research, practice, or administration, or in administrative, fiscal, or other specialized activities; or

(D) to perform consulting or other professional, scientific, technical, administrative, fiscal, or other specialized work of equal importance, difficulty, and responsibility, and requiring comparable qualifications.

5. U.S.C. § 5104(16)(A)–(D) (1976) (emphasis added).

97 S.Ct. at 877, manifesting deliberate consideration of threatened privacy interests.

Thus, while the Constitution allows legislatures broad discretion in drawing necessary lines excluding and including persons in a statute's coverage, the City's selection of $30,000 as a coverage cutoff was neither reasonable nor necessary. The legislative record demonstrates that the $30,000 figure was regarded by every expert and legislator who testified as both overinclusive and underinclusive, and that this imprecision was readily correctable. The $30,000 provision, in fact, was the single aspect of the law that was questioned by representatives of the Mayor, the Board of Ethics, and the Corporation Counsel, who proposed an amendment to enable the Council to overcome the statute's imprecision by allowing the Board to exclude or include job categories in the process of administering the Act.[17] But the Council refused either to delegate or to accept the task of determining whether financial disclosure by persons within a given job category would further some public purpose sufficiently to warrant the resulting invasion of privacy.

c. *The public's right to know.*

The City also justifies LL 48 on the general proposition that it helps insure an informed citizenry. The Supreme Court has recognized in several contexts the strong interest in maintaining an informed citizenry. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); *Mills v. Alabama,* 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966), *Lamont v. Postmaster General,* 381 U.S. 301, 306–07, 85 S.Ct. 1493, 1496, 14 L.Ed.2d 398 (1965); *New York Times v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Professor Emerson and others have suggested that these lines of authority provide a basis for a general right to obtain information for the purposes of personal fulfilment, seeking truth, collective decisionmaking, and effecting social change without violence or coercion. *See* Emerson, *Legal Foundations of the Right to Know,* 1976 Wash.U.L.Q. 1, 2 (authorities collected at n. 2); Note, *The Constitutionality of Financial Disclosure Laws,* 59 Cornell L.Rev. 345, 354–61 (1974). *Compare Redding v. Jacobsen,* 638 P.2d 503, 506–09 (Utah 1981) (discussing authorities); Henkin, *The Right to Know and the Duty to Withhold: The Case of the Pentagon Papers,* 120 U.Pa.L.Rev. 271 (1971); Comment, *The Rights of the Public and the Press to Gather Information,* 87 Harv.L. Rev. 1505 (1974).

Whatever limitations should be placed on the "right to know" in other contexts, the interests that support such a claim operate with special force in connection with laws requiring financial disclosure by public officials. The public's claim to information in such cases is supported by a legislative determination of the propriety of its disclosure. But limits must be placed on this asserted right to know. A principle that would justify exposure to the public of all the information that could conceivably make citizens more informed would justify virtually any disclosure law, however insubstantial the need for disclosure and however substantial the privacy interests affected. Issues of public concern so permeate our lives that each of us is potentially a significant subject of public scrutiny. Public disclosure of the tax returns of all Americans,

---

17. *See supra,* notes 14 & 15. The Committee was apparently ignorant, even with respect to employees in titles it knew were covered by LL 48, of whether their duties warranted coverage:

Councilmember Stern: What about a police captain?
Ms. Grad: I am not sufficiently familiar with the operations of the police department to know whether police captains, what they ought to go on.
Councilmember Stern: You don't know whether police captains should be exempt?
Ms. Grad: If it is in the neighborhood of $30,000.
Councilmember Stern: They do.
Ms. Grad: I believe that presumptively they should apply to the law.
Councilmember Stern: Presumptively? Wouldn't you know? Should we have the Police Commissioner or the Corporation Counsel come in here?
Transcript of July 9 Meeting at 11–12.

for example, would enable the public (including the press) to know about, investigate, and deter tax fraud by all other Americans. Yet, the need for such a law seems dubious, and the disclosures it would require would greatly compromise confidentiality and substantially affect recognized autonomy interests.

Right-to-know theorists have themselves suggested limits for public disclosure in articulating the reasons disclosures are justified. Emerson, for example, finds "a constitutional right in the public to obtain information from government sources necessary or proper for the citizen to perform his function as ultimate sovereign." 1976 Wash.U.L.Q. at 16. The limitations implicit in this principle are precisely those suggested here: in order to perform the governing function, the public must have what it needs to legislate, to elect, and to monitor its policymaking officials; the public need not have private information about government employees who merely implement policy.

Indeed, the distinction between elected and policymaking officials on the one hand, and nonpolicymaking employees on the other, is supported by one of the principal cases relied upon to establish the public's right to know. In *New York Times v. Sullivan,* *supra,* the Supreme Court concluded that in order to preserve "the vigor and ... the variety of public debate" a "public official" must be barred "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'" 376 U.S. at 279–80, 84 S.Ct. at 720. The *Sullivan* Court did not, however, "determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule." 376 U.S. at 283 n. 23, 84 S.Ct. at 727 n. 23. This question was subsequently addressed in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), where the Court found that "public official" includes "those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs." 383 U.S. at 85, 86 S.Ct. at 675. *Sullivan's* protection of the public's right to know limits a plaintiff's rights under the law of defamation only where the plaintiff's "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, *beyond the general public interest in the qualifications and performance of all government employees."* 383 U.S. at 86, 86 S.Ct. at 676 (emphasis added). Regardless of whether some of the officer plaintiffs in this case would be deemed "public officials" in a libel action, *see Gray v. Udevitz,* 656 F.2d 588, 591 (10th Cir.1981) (police officials treated as "public officials" in libel actions) (cases collected), the line drawn in *Rosenblatt* between "public officials" and other government employees is analogous to the distinction between policymaking and nonpolicymaking personnel. A perfect match between the two distinctions is not required to demonstrate that the public's right to know may be outweighed by the rights of individuals positioned below certain points in the hierarchy of government employees; to the contrary a variance is appropriate to reflect the greater need to protect the constitutionally guaranteed right to privacy, as opposed to the common-law right to sue for defamation. Moreover, even with regard to "public officials," a libel defendant is not entitled to the protection of the "actual malice" standard if the alleged falsehood does not touch upon the official's fitness for office. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 273, 91 S.Ct. 621, 626, 28 L.Ed.2d 35 (1971). In short, the "right to know," as reflected in the first amendment, has been found to justify limitations on rights under the law of defamation only with respect to publications about individuals with substantial public responsibility, and only when such persons are discussed in connection with public functions.

Privacy doctrine also inferentially supports the distinction between policymaking and nonpolicymaking employees in determining the propriety of public, financial

disclosure. Thus, "newsworthiness" was early recognized as potentially a proper line between the public's right to know and the individual's right to be let alone:

> Although in their germinal article Warren and Brandeis do not expressly mention the first amendment, they recognize clearly the potential conflict between the individual's "right to be let alone" and the "legitimate interest to their fellow citizens" of *some* of the personal facts of the lives of *some* people. "The design of the law [of privacy]," they said, "must be to protect those persons *with whose affairs the community has no legitimate concern,* from being dragged into an undesirable and undesired publicity." Conversely, they urged that "[t]he right to privacy does not prohibit any publication of matter which is *of public or general interest*" and "to whatever degree and in whatever connection a man's life has ceased to be private, . . . to that extent the protection [of privacy] is to be withdrawn."

Bloustein, *The First Amendment and Privacy: The Supreme Court Justice and the Philosopher,* 28 Rutgers L.Rev. 41, 54–55 (1974) (footnotes omitted) (emphasis original). A determination of what is "of public or general interest"—that is, of what is newsworthy—focuses "on whether or not the information is relevant to the public's governing purposes." *Id.* at 56. Thus " '[p]ublic interest,' taken to mean curiosity, must be distinguished from 'public interest,' taken to mean value to the public of receiving information of governing importance." *Id.* at 56–57.

Precisely this distinction is recognized in determining the reach of the "actual malice" standard:

> [A] conclusion that the . . . malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the

scrutiny and discussion occasioned by the particular charges in controversy.

*Rosenblatt v. Baer, supra,* 383 U.S. at 86–87 n. 13, 86 S.Ct. at 676 n. 13. As nonpolicy-making public employees, plaintiffs are not in positions that invite public scrutiny of their financial affairs or make those affairs relevant to the public's need to fulfill its governing functions. A less restrictive view of the public's right-to-know would disregard society's interest in protecting the privacy of citizens who happen to be employed by government.

Mere invocation of the public's right to know plainly cannot resolve its proper application in this case. "The proper boundaries of the right to know cannot be fixed by recourse to a single abstract principle." W. Gellhorn, *The Right to Know: First Amendment Overbreadth?,* 1976 Wash.U. L.Q. 25, 28. "Society does not choose merely between the 'good' of free speech or free press and the 'evil' of oppression. Rather, society is constantly selecting among competing values to establish its principles governing communication." *Id.* at 25. In his own advocacy of a right to know, Professor Emerson is careful to recognize the right to privacy as the most significant limitation on the right to know. Emerson, *supra,* 1976 Wash.U.L.Q. at 20–23.

Our nation has recognized the valid interest in publicly disclosing information about or relevant to all aspects of government. Yet, public disclosure is limited in every sphere and at every level of government activity, to protect a variety of interests, among the most prominent of which is privacy. The Constitution mandates public trials in some cases, for example, for a variety of historical purposes. *See* U.S. Const. amend. VI; *see also* N.Y.Jud.Law § 4 (McKinney 1968); N.Y.Civ.Rights Law § 12 (McKinney 1976). The right to attend even a criminal trial, however, is not absolute. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581 n. 18, 100 S.Ct. 2814, 2830 n. 18, 65 L.Ed.2d 973 (1980). Furthermore, not every judicial proceeding is open to public scrutiny; and the need to protect

privacy interests is high among the considerations that justify nonpublic proceedings. *See, e.g., United States ex rel. Latimore v. Sielaff,* 561 F.2d 691, 695 (7th Cir.1977) (exclusion of spectators during testimony of rape victim did not violate right to public trial); *United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274 (2d Cir.1975) (exclusion of public constitutionally acceptable where necessary to maintain confidentiality of undercover narcotics agents); N.Y.Crim. Proc.Law § 720.15 (McKinney 1971) (privacy afforded for youthful offender proceedings); 22(c) N.Y.C.R.R. § 2501.2 (privacy for juvenile proceedings in Family Court); *see also Redding v. Jacobsen, supra,* 638 P.2d at 507 (right of courts to limit public disclosure of certain proceedings). Similarly, grand juries function in secret, in part to avoid disclosing prior to indictment the identities of and allegations against grand jury targets and witnesses.[18]

Our legislatures and their committees wield the investigative power, which is extremely broad, and has been recognized as a vehicle not only for preparing Congress to legislate, but also for securing information on matters of public concern. *E.g., McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927). But that great power, too, has been limited because of privacy interests. As the Supreme Court stated in *Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957) (footnote omitted):

> [T]here is no . . . power to expose for the sake of exposure. The public is, of course, entitled to be informed concerning the workings of its government.

That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals.

*Cf. Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 557–58, 83 S.Ct. 889, 899, 9 L.Ed.2d 929 (1963). The Freedom of Information Act, and analogous state and local laws, all contain provisions limiting public access where the information might compromise privacy interests. *See* 5 U.S.C. § 552(b)(6); N.Y.Pub.Off.Law § 89(2)(b) (McKinney Supp.1981–82). And countless federal and state laws are on the books that expressly limit access to private information, for the purpose of protecting privacy. *E.g.,* 26 U.S.C. §§ 6103(a)(1) & 7213(a)(1) (tax returns confidential); 13 U.S.C. § 9(a) (census information confidential); N.Y.Civ.Rights Law § 50–a(1) (McKinney 1976) (personnel records of police officers confidential absent consent of officer); N.Y.Tax Law § 697(e) (McKinney's Supp.1978) (tax returns confidential). *See generally* Givens, *The Law on Right to Financial Privacy,* N.Y.L.J., Jan. 15, 1979, p. 1, col. 2.

These and other limits on public disclosure apply to governmental functions no less essential than the exposure and deterrence of corruption and conflicts of interest. They reflect national values that cannot be set aside by the mere invocation of ends so vague and uncircumscribed as the need to inform the public, or the public's right to know. Where tangible privacy interests are at stake, a need for public disclosure must be tangibly alleged and established, unless the public employees involved are

---

**18.** *See* Fed.R.Crim.Proc. 6(e). Two of the four reasons generally considered to support grand jury secrecy are: "To prevent disclosure of derogatory information presented to the grand jury against an accused who has not been indicted. [and] [t]o encourage complainants and witnesses to come before the grand jury and speak freely without fear that their testimony will be made public thereby subjecting them to possible discomfort or retaliation." *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 405, 79 S.Ct. 1237, 1243, 3 L.Ed.2d 1323 (1959) (Brennan, J., dissenting).

*See also* Fed.R.Civ.P. 26. Rule 26 permits discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . [u]nless otherwise limited by order of the court in accordance with these rules." Thus irrelevant matters, or matters relevant but privileged according to the Federal Rules of Evidence, are not discoverable. Moreover, the courts possess broad discretion to deny discovery entirely even of relevant matters, or to limit discovery by subject matter, by method or terms, by who has access to material discovered, or by sealing discovered material in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c).

engaged in policymaking and are therefore proper subjects of public scrutiny.[19]

### 3. Conclusion

Public disclosure of the information called for by LL 48 will seriously affect privacy interests, without advancing any substantial societal need. Plaintiffs are entitled to no less protection of their privacy than ordinary citizens; limits on their privacy rights cannot be justified on this record by special needs related to their actual employment. The federal courts must guard against the possibility that elected government officials faced with pressures for unlimited fiscal disclosure, particularly from the press upon which they depend for coverage and from which they regularly seek support, may too readily subject career government servants with no significant policymaking functions to the same degree of disclosure appropriate for themselves.[20]

### V. Severability of Filing Provisions

■ Plaintiffs argue that, if the Court invalidates LL 48's public disclosure provisions, the entire law must be invalidated as it applies to plaintiffs, including its filing requirement. "The intent of the lawmakers" governs whether the remainder of a statute should be enforced after a substantial part of the law has been held invalid. *Carter v. Carter Coal Co.,* 298 U.S. 238, 312, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936). In enacting LL 48, the City Council was well aware that the provisions permitting public disclosure might be ruled invalid while the filing requirements would be upheld. Just such a decision was rendered in *Hunter v. City of New York, supra,* which invalidated the public disclosure portions of LL 48's predecessor, LL 1. With knowledge of that possibility, the Council reenacted (and relettered "subdivision (h)") in LL 48, the former subdivision (e) of LL 1, which states:

> If any provision of this section shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, it is the purpose and intent of this section that all other provisions hereof shall nevertheless be separately and fully effective and that the application of any such provision to other persons or situations shall not be affected.

The Council's clear intent was that, in the event its new "privacy mechanism" did not save the public disclosure provisions from the fate they earlier met in *Hunter,* the filing requirements would be preserved.

Plaintiffs' reliance on *Marchetti v. United States,* 390 U.S. 39, 58–60, 88 S.Ct. 697, 707, 19 L.Ed.2d 889 (1968), *Grosso v. United States,* 390 U.S. 62, 69, 88 S.Ct. 709, 714, 19 L.Ed.2d 906 (1968), and *Haynes v. United States,* 390 U.S. 85, 99–100, 88 S.Ct. 722, 731, 19 L.Ed.2d 923 (1968) is misplaced. Severing the disclosure provisions in those cases would have harmed interests Congress wished to advance by the legislation at issue. In that posture, the Court found that it could not know how Congress would assess the competing interests that would be advanced and harmed by severing the unconstitutional aspects of the law. *Marchetti v. United States, supra,* 390 U.S. at 59–60,

---

**19.** Judge Gesell of the District Court for the District of Columbia has said:

> In this immediately post-Watergate period, the view exists that conflicts of interest can be expunged by forcing intimate disclosures from those dealing with or acting for the government. Within limits this may be sound, but we must beware lest excessive zeal in this direction destroy more precious fundamental values. People, even people working for the government, have within reason the right to be left alone.

*American Fed'n of Gov't Employees v. Schlesinger, supra,* 443 F.Supp. at 434.

**20.** One Councilmember thus frankly explained his vote just before LL 48's enactment:

> Very briefly, I'd like to explain my vote. I have always opposed the concept of this kind of legislation, because I don't think that it is going to serve any great public service. It will pander to the newspapers and media, who are looking for gossipy bits of information. However, I'd be a political fool if I voted against this legislation, so I vote reluctantly aye with the reservations that I have indicated.

Transcript of July 9 Meeting at 42. *See* Paletz & Entman, *Media Power Politics* 249 (1981).

88 S.Ct. at 708. Plaintiffs here cannot seriously contend that upholding the filing provisions will harm any interests the City Council sought to advance in LL 48. The evidence established that limited disclosure might improve the City's ability to detect and deter corruption and conflicts of interest. Limiting disclosure to the City in these circumstances would in no way undermine that goal, or decrease public confidence in government. Accordingly, given the City Council's express intent that any unconstitutional aspect of LL 48 be severed, the remainder to operate in full force, the law is invalid only insofar as it permits public disclosure of the filings made by plaintiffs.[21]

Plaintiffs are awarded judgment, based on the findings and conclusions stated in this opinion, invalidating subdivisions (c), (d) and (e) of LL 48 insofar as they permit the City Clerk or any other government employee to make available for public inspection information filed pursuant to the law by members of the plaintiff classes.

The Clerk will enter judgment accordingly.

SO ORDERED.

---

**21.** An argument could be made that severance should be denied because the City has made no provision for keeping confidential the information filed. That shortcoming is readily rectifiable, however, in that the information can be processed and filed with the City Clerk, as LL 48 now requires, pending the Council's passage of further legislation providing for security and limited access, if the Council deems such legislation necessary. The City Clerk, meanwhile, will be permitted to allow access to the City's Commissioner of Investigation or his authorized staff members, and to the investigative units in the Fire and Police Departments. As indicated above, plaintiffs have no substantial privacy expectations against disclosure of the mandated information to City officials engaged in some legitimate governmental function. These individuals, in turn, must treat the information with the same degree of confidentiality now accorded private information in the City's personnel records.